923 A.2d 325 (2007)
393 N.J. Super. 355
ESTATE OF Patricia ALBANESE, Clara Heffernan, Individually and as Executrix of the Estate of Patricia Albanese, Anne Albanese and Judy Albanese,[1] Plaintiffs-Appellants,
v.
John R. LOLIO, Jr., Esq., Sherman, Silverstein, Kohl, Rose & Podolsky, P.A., Defendants-Respondents, and
Michael De Lorey, C.F.P. and Prism Financial Group, Inc., Defendants.
Superior Court of New Jersey, Appellate Division.
Argued September 13, 2006.
Decided June 4, 2007.
*327 Robert F. Gold, Red Bank, argued the cause for appellants (Gold, Albanese, Barletti & Velazquez, attorneys; Mr. Gold, of counsel; Christian Bruun, on the brief).
Elliott Abrutyn, Livingston, argued the cause for respondents (Morgan Melhuish Abrutyn, attorneys; Mr. Abrutyn, of counsel; Mr. Abrutyn and Shaji M. Eapen, on the brief).
Before Judges STERN, COLLESTER and SABATINO.
The opinion of the court was delivered by
STERN, P.J.A.D.
Plaintiffs, the executrix of her mother's estate, her co-beneficiary-sisters, and the estate itself, appeal from an order of March 4, 2005 granting summary judgment to defendants John Lolio and his law firm (hereinafter "defendants") in this legal malpractice case stemming from advice given to the executrix on how to pay federal estate taxes that resulted in large tax liability to each of the individual plaintiffs. The critical issues before us are (1) whether defendants owed a duty to the individual beneficiaries to inform them of the personal tax implications which flowed from defendants' advice, and (2) whether the defendants breached a duty to the executrix to make the scope of their representation clear.
The motion judge granted summary judgment to defendants, holding that "[p]laintiffs were third party non-clients of [d]efendants [, and] [d]efendants were retained to be counsel for the Estate and not the individual beneficiaries." The judge further concluded that defendants owed a duty to the Estate alone, as the beneficiaries' individual interests may have conflicted with the interests of the Estate.
Plaintiffs argue that the defendants owed them a duty as individuals and that the terms of the retainer agreement included representation of the individual beneficiary-plaintiffs. We reverse the judgment insofar as plaintiff Clara Heffernan, the executrix, is concerned. We affirm as to the other beneficiaries.

*328 I.
Patricia Albanese ("decedent") died on August 5, 2000. She was survived by three daughters, plaintiffs Clara Heffernan ("Clara"), Anne Albanese, and Judy Albanese, all of whom were beneficiaries under the will. Clara, decedent's executrix, retained defendant John R. Lolio, an attorney at law of the State of New Jersey of the law firm of defendant Sherman, Silverstein, Kohl, Rose & Podolsky, P.A. who had served as decedent's attorney and had prepared her Last Will and Testament, with respect to the estate.
Plaintiffs assert that defendants were retained by Clara to represent the Estate and each of the plaintiffs as individuals. They also contend that Clara similarly retained the services of defendant, Michael DeLorey ("DeLorey") of defendant Prism Financial Group, Inc., to do financial planning on behalf of the individual plaintiffs as well as the Estate. They further claim that defendants and DeLorey "spoke at least a dozen times during the administration of the Estate" and "were working together . . . to figure out the best way to pay the Federal Estate Taxes without exposing [plaintiffs] to any personal income tax liability."[2]
Defendants assert that they "were retained by [Clara] solely in her capacity as Executrix of Patricia Albanese's estate." To support this contention, they emphasize that the opening of the agreement reads that Clara, as executrix, retained defendants "as attorneys to represent the Estate[,]" and they note that the agreement "does not mention beneficiaries or that the scope of the . . . retention includes providing services/personal tax advice to the beneficiaries." Defendants further assert that they "did not take any action, nor act in any manner, that could cause [plaintiffs], in their individual capacities, to believe that the [defendants] represented their personal interests or were acting for them individually."
The retainer or "fee agreement" with defendants provides that "CLARA HEFFERNAN, Executrix of the Estate of PATRICIA A. ALBANESE, does hereby retain and employ the Law Firm of SHERMAN, SILVERSTEIN, KOHL, ROSE AND PODOLSKY, P.A. as attorneys to represent the Estate." The agreement further provides that, in addition to handling matters before the Surrogate's Office and Probate Courts, defendants would

advise us and cause all necessary and proper steps to be taken for the purpose of fixing and paying any and all Federal and State estate taxes and other transfer taxes, the collection of all assets. . ., the payment of all debts . . ., the distributions of the assets that may then remain . . ., the accounting for the acts of the Executrix as the representative of such Estate, and in general the doing of all acts and things necessary for the full and complete settlement of the Estate of the decedent.
[Emphasis added.]
The Agreement also states that defendants "shall" be responsible for "[p]ost-mortem planning, including, but not limited to, calculating tax needs[,]" and for "collaboration with the Executrix to obtain the most beneficial tax results." The agreement was signed by defendant Lolio for the firm and by Clara Heffernan, "Individually and as Executrix of the Estate of Patricia A. Albanese."
The Estate was sizable. It included real estate, cash, stocks and bonds, life insurance and other assets including an IRA. Each of the sisters was to receive similar, *329 but not identical, shares of the Estate valued at over $1,000,000 each, and Clara's children were to receive $10,000 each. Decedent's death also triggered the distribution of a "credit shelter trust" that was created under her late husband's will.
The federal estate tax owed by the Estate totaled over $900,000. In order to pay the estate tax, Clara, allegedly upon the advice of Lolio and DeLorey, withdrew funds from the IRA and thereafter made equal distributions to plaintiffs in April 2001. This resulted in a personal income tax burden on the individual plaintiffs of approximately $298,000 each.[3]

II.
A factual dispute exists as to the advice plaintiffs received prior to making the distributions.
First, plaintiffs contend that they were not apprised of other options for paying the Estate taxes aside from using the Estate's IRA, although they now assert that alternatives existed. In their brief, plaintiffs state, "[d]efendant [l]awyers faxed a letter and called the Estate's financial planner, [DeLorey], to advise that the Estate taxes were going to be paid by withdrawing funds from the Estate's IRA." According to DeLorey, he was "completely surprised" by this, explaining that "[i]t's going to cause, you know, estate taxes." In response, Lolio reportedly told him, "that's the only assets they have." Further, DeLorey testified that he did not mention the tax consequences of using the IRA to pay the estate taxes to any of the plaintiffs, "[b]ecause [Lolio] told me these were the only assets available to pay the taxes from."
Plaintiffs further assert that, despite Lolio's testimony to the contrary, he never outlined options by which Clara could pay the estate taxes. At her deposition, Clara testified that Lolio told her that the bulk of the Estate's assets were in the IRA, no other options for paying the taxes were shared with her, and the decision to use the IRA funds to pay the estate taxes was made because she "didn't feel like there were really any other options at the time." However, earlier in her deposition, Clara also stated that Lolio "said there are various places to take the funds from," but was unable to remember anything more specific about that conversation.
Defendants contend that Lolio advised Clara of other options for paying the taxes aside from using funds from the IRA, but none of these conversations were memorialized in writing. Lolio testified that, at the time a distribution was made from the trust created by plaintiffs' father, he told Clara over the telephone "that money could be used to pay the estate taxes." He stated that Clara "didn't comment one way or the other" regarding this option, although she was aware at that time that the estate tax on decedent's estate "would be [roughly] about a million dollars." Lolio also testified that he discussed three options with Clara on three separate occasions:
[o]ne was to borrow money against the shore property to pay the tax. . . . That wasn't a viable option. They could just about make the mortgage, based on the current mortgage they had. That was her comment. The other was to sell the shore property, which they did not want to do. Then basically the other option was to take some of the money out of the IRA. Because there wasn't other assets under the decedent's name, probate assets, to pay the tax.
*330 Lolio further testified that he did not know if DeLorey advised Clara to pay the estate tax with funds from the IRA.
Second, plaintiffs assert that defendants "failed to advise [them] of [their] personal income tax liability" that would result from withdrawing funds from the IRA, and they only became aware of the liability in 2002 while filing their individual 2001 tax returns. Defendants contend that this advice was given. Lolio testified that he "told [Clara] whatever money she takes out of the IRA is going to have personal income tax consequences[,]" although he did not elaborate as to what the consequences would be nor suggested that she speak to an accountant to obtain specific figures. During his deposition, Lolio also acknowledged that he "never spoke" to Clara about the tax consequences of an IRA withdrawal on her sisters, and he did not make a written record of his warning to Clara about the tax consequences of invading the IRA. He added that he was "sure that [DeLorey's] office would have advised them accordingly. . . ."
Defendants also contend that personal income tax advice was not part of their representation of the Estate, and they assert that Clara "never discussed or consulted [Lolio] for personal income tax advice." To support this contention, they cite Clara's deposition testimony that she did not recall ever seeking or receiving personal income tax advice from Lolio. They also assert that Clara was aware of the tax consequences of withdrawing funds from an IRA, regardless of the advice she was given by them, because of "her job responsibilities as administrator of the 401-K profit sharing plan at her place of business." However, Clara testified that, prior to the events of this case, she knew that "there's a tax consequence" when IRA funds are withdrawn, but she did not know what that consequence was, and no employees had yet retired from her company. Further, defendants state that, since the individual plaintiffs signed IRA Asset Movement Authorizations executed in connection with their inheritance in April 2001, they were aware of the tax consequences of invading the IRAs. Defendants base this assertion on language in the Asset Movement Authorization form, which states:
I hereby certify that I understand the conversion or rollover rules and conditions as they pertain to this retirement account. . . . Due to the important tax consequences of converting or rolling over funds or property, I have been advised to consult with a tax professional. . . . I assume full responsibility for these transactions and will not hold the Custodian liable for any adverse consequences that may result.
Additionally, Lolio testified that, in April 2001, he "believe[s]" a paralegal in his office spoke to DeLorey's assistant and "basically advised [DeLorey's assistant] to make sure [plaintiffs] were aware of the tax consequences of using the IRA money to pay the tax." However, the only advice received by the three sisters from DeLorey was at a September 6, 2000 meeting at which DeLorey advised plaintiffs of the nature of his financial services and apprised them of what he did for their mother. DeLorey testified that, at that meeting, he told them of the possibility of personal tax consequences as a result of invading the IRA, but did not specify any detail. DeLorey further testified that he set up beneficiary IRAs for all three plaintiffs, but did not discuss how the estate taxes on decedent's estate would be paid.

III.
As the case was settled by plaintiffs with DeLorey and his firm, we review only the summary judgment granted to defendants.
*331 Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). Further, "[a]n issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." Ibid. To make this determination, the judge must "engage in the same type of evaluation, analysis, or sifting of evidential materials as required [in deciding motions for directed verdicts under] Rule 4:37-2(b) in light of the burden of persuasion that applies if the matter goes to trial." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995).
The same standards apply to appellate review of summary judgment orders. Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998). However, when the trial court's decision turns on a question of law, the "trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty v. Manalapan Twp. Comm., 140 N.J. 366, 378, 658 A.2d 1230 (1995). Here, as demonstrated above, contested facts certainly exist concerning the advice given to Clara by Lolio. However, that factual dispute is "material" only if defendants owed a duty to Clara or to the plaintiffs as to their individual tax liability. Accordingly, we must decide whether there is a genuine dispute of material facts concerning that subject.
"[T]he requisite elements of a cause of action for legal malpractice are: `(1) the existence of an attorney-client relationship creating a duty of care upon the attorney; (2) the breach of that duty; and (3) proximate causation.'" Estate of Fitzgerald v. Linnus, 336 N.J.Super. 458, 467, 765 A.2d 251 (App.Div.2001) (quoting Conklin v. Hannoch Weisman, 145 N.J. 395, 416, 678 A.2d 1060 (1996)). In this case, we focus on whether the defendants owed plaintiffs a duty of care.
The motion judge relied on Barner v. Sheldon, 292 N.J.Super. 258, 678 A.2d 767 (Law Div.1995), aff'd, 292 N.J.Super. 157, 678 A.2d 717 (App.Div.1996), and Estate of Fitzgerald, supra, in granting summary judgment to defendants based on the lack of duty. According to the judge:
[t]he Defendants did not owe a duty to the Plaintiffs in their individual capacity as beneficiaries. The Defendants were retained by the Estate and to require them to have performed an individual tax assessment for each plaintiff would have been outside of the scope of the retainer agreement. Furthermore, the Plaintiff's individual tax situation could very well have been adversarial to the interests of the Estate. What could have been beneficial to the Plaintiff's tax situation could have been detrimental towards the Estate[']s tax situation as a whole. Therefore, in applying the holding in Barner, Defendants did not owe a duty to Plaintiffs[,] because their interests as beneficiaries trying to maximize their tax situation may be adversarial to the interests of the Estate. Furthermore, the Plaintiffs any time could have retained their own attorney or financial consultant to advise them of their own individual tax situation. The fact that they chose not to do so should not mean that they can now hold Defendants liable for their current tax situation. Also, the *332 Plaintiffs were presented with an IRA Asset Movement Authorization by the Defendants and were each aware of the tax consequences arising from executing the authorization. If the Plaintiffs had any concerns stemming from the execution of this document they were free to retain their own tax professional.
The judge also stated:
In applying the fairness and policy standard enunciated in Fitzgerald, there still is no basis for finding that the Defendants owed Plaintiffs a duty in this case. In fact, policy and fairness would suggest that we hold that the Defendants not have a duty towards the Plaintiff. A contrary holding would subject attorneys in the Defendants['] position to a potentially infinite number of lawsuits from beneficiaries of an estate. One could easily imagine a situation where an estate has many beneficiaries, whose interests may be adverse. Surely, it cannot be said that the estate's attorney would owe each a duty and be subject to liability for any potential violation of that duty. Also, this would put defendants in the precarious situation of having to anticipate potential lawsuits from beneficiaries, taking their focus away from acting in the best interests of the Estate. For as the court stated in Barner, that such an open ended responsibility on the part of an attorney "might well paralyze the administration of an estate." Barner, supra, at 267, 678 A.2d 767[(]quoting [In re] the Estate of Jerry M. Barner, No. A-3100-90T5 (App.Div.1992)[)].
We now review that determination.

IV.
Generally, an attorney owes a duty only to his or her client, and the client is identified in the retainer agreement. R.P.C. 1.2. Determining if a duty exists to a third party in a specific situation is a question of law, where the court must "balanc[e] the attorney's duty to represent clients vigorously with the duty not to provide misleading information on which third parties foreseeably will rely[.]" Petrillo v. Bachenberg, 139 N.J. 472, 479, 655 A.2d 1354 (1995) (citations omitted). The duty of care required of attorneys obligates them to
use the reasonable knowledge and skill in the transaction of business which lawyers of ordinary ability and skill possess and exercise. On the one hand[,] he is not to be held accountable for the consequences of every act which may be held to be an error by the court. On the other hand, he is not immune from the responsibility, if he fails to employ in the work he undertakes that reasonable knowledge and skill exercised by lawyers of ordinary ability and skill.
[Stewart v. Sbarro, 142 N.J.Super. 581, 590, 362 A.2d 581 (App.Div.) (quoting McCullough v. Sullivan, 102 N.J.L. 381, 384, 132 A. 102 (E. & A.1925)), certif. denied, 72 N.J. 459, 371 A.2d 63 (1976).]
Whether this duty extends to non-clients is "necessarily fact-dependent." Estate of Fitzgerald, supra, 336 N.J.Super. at 473, 765 A.2d 251. "[L]awyers' duties in specific cases vary with the circumstances presented. `What constitutes a reasonable degree of care is not to be considered in a vacuum but with reference to the type of service the attorney undertakes to perform.'" Id. at 467-68, 765 A.2d 251 (quoting Ziegelheim v. Apollo, 128 N.J. 250, 260, 607 A.2d 1298 (1992) (quoting St. Pius X House of Retreats v. Diocese of Camden, 88 N.J. 571, 588, 443 A.2d 1052 (1982))).
Privity between an attorney and a non-client is not necessary for a duty to attach "where the attorney had reason to *333 foresee the specific harm which occurred." Albright v. Burns, 206 N.J.Super. 625, 633, 503 A.2d 386 (App.Div.1986); see also Petrillo, supra, 139 N.J. at 478, 655 A.2d 1354. Further, "attorneys may owe a duty of care to non-clients when the attorneys know, or should know, that non-clients will rely on the attorney's representations and the non-clients are not too remote from the attorneys to be entitled to protection." Petrillo, supra, 139 N.J. at 483-84, 655 A.2d 1354; see also Stewart, supra, 142 N.J.Super. at 593, 362 A.2d 581. To determine if that duty exists, a court conducts an "inquiry [that] involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." Barner, supra, 292 N.J.Super. at 261, 678 A.2d 767 (quoting Goldberg v. Hous. Auth. of Newark, 38 N.J. 578, 583, 186 A.2d 291 (1962)). The primary question in this inquiry is one of fairness. Id.; see also Estate of Fitzgerald, supra, 336 N.J.Super. at 468, 765 A.2d 251.
New Jersey law regarding the scope of the duty owed by an attorney retained to assist in the administration of an estate to the executrix, individually, and to beneficiaries of that estate has been developed in Barner v. Sheldon, supra, and Estate of Fitzgerald v. Linnus, supra. As such, we provide an overview of each decision.
In Barner v. Sheldon, supra, defendant attorney prepared a will "in which [decedent] left his business equally to his three children, the plaintiffs[,]" and the residuary of his estate to his children and his wife, also in equal parts. Barner, supra, 292 N.J.Super. at 260, 678 A.2d 767. The decedent's initial intent was to disinherit his wife, but he left her a portion of the residuary estate after being told that, if disinherited, she could take a larger elective share. Ibid. Decedent's wife died approximately two years later, and plaintiffs inherited her entire estate. Ibid. Plaintiffs then sued defendant attorney for legal malpractice, "alleg[ing] that the defendant had a duty to inform them that they had a right to disclaim their share of their father's estate [] in favor of their mother, which would have resulted in either an avoidance or diminution of federal estate taxes." Ibid. In granting summary judgment for defendant, Judge Alexander Menza in the Law Division noted that
[a] review of the case law demonstrates that there may be situations where a duty to the beneficiary should be impressed on the attorney, such as when the attorney undertakes a duty, or in an egregious situation  in other words in limited situations. It is also clear that if a beneficiary's interest is adversarial to the interest of the estate and contrary to the will of the testator, then no such duty shall be imposed upon the attorney.
[Id. at 266, 678 A.2d 767.]
Judge Menza further concluded that defendant acted appropriately because he followed the testator's wishes, and the tax consequences were irrelevant because of his desire to keep most of his estate out of his wife's hands. Id. at 266-67, 678 A.2d 767.
In concluding "that the defendant had no duty to the plaintiff beneficiaries to advise them to disclaim[,]" Judge Menza also quoted our prior unreported opinion in the same litigation in which we stated:
we know of no authority for the broad proposition urged by appellants that an executrix must apprise beneficiaries of the tax consequences of a gift. Such an open-ended responsibility might well paralyze the administration of an estate.
[Id. at 266-67, 678 A.2d 767 (quoting In re the Estate of Jerry M. Barner, No. A-3100-90T5 (App.Div.1992)).]
*334 In affirming the grant of summary judgment in Barner, we held that:
defendant had no duty to inform the beneficiaries of the tax consequences of their failure to disclaim under these circumstances. The testator's intent, conceded by plaintiffs, was to minimize benefits to [his] wife by his will. Had plaintiffs, the testator's children, disclaimed, the testator's wife would have [benefited]. This would have been contrary to the testator's intent.
[Id. at 158, 678 A.2d 767.]
In Estate of Fitzgerald, supra, we declined to extend an attorney's duty to the executrix of an estate to the executrix individually or as a beneficiary of the estate and also refused to extend the duty to non-beneficiary children of the executrix. We held that fairness does not "impose a duty on an attorney representing an estate[] the obligation to advise on matters of post-mortem estate planning." Estate of Fitzgerald, supra, 336 N.J.Super. at 471, 765 A.2d 251. In that case, the decedent's wife and children asserted that the attorney owed them a duty as individuals. Id. at 461, 765 A.2d 251. Plaintiffs' primary argument was "that defendant negligently failed to advise [decedent's wife, the beneficiary and executrix of his will,] Joan that she could disclaim a portion of her husband's life insurance proceeds in favor of the children[,] which would have resulted in a substantial estate tax savings upon Joan's death." Ibid.
The decedent, "a C.P.A . . . . who held both J.D. and M.B.A. degrees, died suddenly" and "left his entire probate estate to Joan and named her as executrix." Id. at 461-62, 765 A.2d 251. Based substantially on the value of the life insurance that passed outside of the will, Joan inherited over two million dollars. Id. at 462, 765 A.2d 251. Decedent's will was prepared by defendant eight years before defendant's death. Ibid. The will was drafted "in accordance with decedent's instructions, including that defendant `not engage[] in any estate planning' at that time, as decedent would prepare an estate plan and advise defendant whether the wills were suitable." Ibid. Decedent never created an estate plan, but did execute the will "approximately fourteen months prior to [his] death." Ibid.
On March 7, 1996, the day after decedent's death, Joan "retained defendant to aid her in administering decedent's estate." Ibid. In discussing the estate with defendant, "Joan expressed concern . . . about whether the benefits of the [life insurance] policies would be paid under the circumstances of decedent's death[] and instructed defendant to collect the proceeds." Ibid. Defendant "corresponded with decedent's life insurance companies, obtained proceeds for Joan by mid-April, and, according to Joan, `advised that [she] could simply deposit those checks and utilize them as [she] saw fit.'" Id. at 463, 765 A.2d 251. According to Joan, after she cashed the checks, a friend who was also an estate planning attorney advised her that she "could have disclaimed some of the insurance proceeds and have those proceeds go to [her] children, so that [the funds] would never become part of [her] estate." Ibid. Joan thereafter retained the friend who took over administration of the estate and advised her to sue defendant. Ibid.
At trial,
[t]he parties agree[d] that they never discussed Joan's estate, the impact of decedent's insurance policy proceeds on Joan's future estate taxes, or the possibility of disclaiming a portion of those proceeds prior to Joan's receipt and deposit of the funds on or about April 15 and 22, 1996. They also agree[d] that Joan stated, and that defendant understood, *335 that Joan was obtaining separate financial and tax planning advice, and that defendant had no knowledge of the identity of Joan's advisor until late April or early May . . . .
[Id. at 464, 765 A.2d 251.]
The understanding that Joan was "obtaining financial advice and estate planning advice and that [defendant was] to continue to process [decedent's] estate without regard to the impact on [Joan's] estate[,]" was confirmed to Joan in a May 8, 1996 letter from defendant. Id. at 465, 765 A.2d 251. Additionally, defendant defended his actions by stating that he
believe[d] [he] was retained to carry out the wishes of the testator . . . [who] . . . as an attorney and as a [C.P.A.] was fully knowledgeable . . . about the estate planning and what it would take to create an estate plan that would potentially avoid or eliminate or lessen the impact of estate taxes on . . . his wife's estate.
[Decedent] made it very clear that he wanted an outright distribution will, and that was what was prepared.
[Id. at 464, 765 A.2d 251.]
Moreover, because Joan was concerned about collection of the life insurance policies and continuation of her lifestyle and income flow as decedent's salary "was gone," defendant testified that Joan "wanted [him] to process and probate [decedent's] will as quickly as possible so that she would receive the money from [his] estate." Id. at 463, 765 A.2d 251.
In these circumstances, we affirmed summary judgment for defendant. As stated by Judge Philip Carchman:
The absence of an attorney-client or fiduciary relationship does not necessarily bar a legal malpractice claim by a non-client where an independent duty is owed. Whether that duty exists is a question of law to be determined by the court, and ultimately turns on considerations of fairness and policy. "The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution."
[Id. at 468, 765 A.2d 251 (citations omitted).]
Judge Carchman further elaborated,
[o]n these facts, as viewed in the light most favorable to plaintiffs, the judge properly determined there was no evidence that Joan had engaged defendant for her own estate planning purposes. . . . [W]e conclude that Joan's claim fails because defendant owed Joan no duty with regard to her own estate planning, as he was retained by Joan solely in her capacity as executrix of decedent's estate.
The role of an attorney can be circumscribed by the terms of his or her engagement by the client. Here the engagement was narrowly conceived by both parties and defendant's role was clearly delineated. Certainly, defendant could have given advice as to the potential savings when Joan dies by disclaiming $600,000, but there was no duty to do so. The suggestion that an attorney retained to represent an estate has an affirmative obligation to engage an executrix-wife in post-mortem estate planning fails to recognize the realities of the retention and that of a limited attorney-client relationship.
[Id. at 470-71, 765 A.2d 251.]
We also found no "unfairness" in the circumstances, and determined
that defendant's duties to Joan both as client-executrix and sole beneficiary of decedent's probate and non-probate assets were fully met. Defendant's administration of the estate comported not only with decedent's "will and wisdom" to leave his entire estate, including the *336 insurance policy proceeds, to his surviving wife rather than to his children, but also with Joan's express instructions and her duties as client-executrix to settle and distribute the estate in accordance with the terms of decedent's will and applicable law, "`as expeditiously and efficiently'" as was consistent with the best interests of decedent's estate.
[Id. at 472, 765 A.2d 251 (citations omitted).]
We concluded:

Barner supports the view that defendant owed no duty to plaintiffs and that the motion judge properly dismissed their claims. We recognize that the realities of the practice of law may cause one attorney to offer post-mortem estate planning advice to a widow seeking estate representation, while another attorney may view his or her role as circumscribed within the limits of the retainer. Although determining whether a duty exists is necessarily fact-dependent, generally, neither attorney would be acting improperly or violating any duty to the client under these circumstances. Defendant's choice of the latter course here does not form the basis of a cause of action.
[Id. at 472-73, 765 A.2d 251 (citations omitted).]
Based on this precedent, we reverse the grant of summary judgment as to Clara, and affirm the judgment based on the judge's conclusion as to her sisters.

A.
Defendants' relationship to Clara is unclear. The retainer agreement created a relationship between defendants, on the one hand, and Clara "individually and as executrix," on the other.[4] It required defendants
to advise us and cause all necessary and proper steps to be taken for the purposes of fixing and paying any and all Federal and State estate taxes and other transfer taxes, . . . the distribution of the assets that may then remain of the said decedent among those entitled thereto, the accounting for the acts of the Executrix as the representative of such Estate.
[Emphasis added.]
The retainer also obligated defendants to advise and counsel as to "[p]ost-mortem planning, including, but not limited to, calculating tax needs."
As our Supreme Court recently articulated,
[w]hen a contract term is ambiguous, that rule of contract interpretation requires a court to adopt the meaning that is most favorable to the non-drafting party. The doctrine may be utilized after a court has examined the terms of the contract, in light of the common usage and custom, and considered the circumstances surrounding its execution. If, at that time, the court is unable to determine the meaning of the term, contra proferentem may be employed as a doctrine of last resort. The rationale behind that method of interpretation is that "[w]here one party chooses the term of a contract, he is likely to provide more carefully for the protection of his own interests than for those of the other party. He is also more likely than the *337 other party to have reason to know of uncertainties of meaning." Importantly, contra proferentem is only available in situations where the parties have unequal bargaining power. If both parties are equally "worldly-wise" and sophisticated, contra proferentem is inappropriate.
[Pacifico v. Pacifico, 190 N.J. 258, 267-68, 920 A.2d 73 (2007) (citations omitted).]
Given the wording of the agreement prepared by defendants, Clara may have had a reasonable expectation of representation as an "individual" as well as executrix. Cf. President v. Jenkins, 180 N.J. 550, 562-63, 853 A.2d 247 (2004) (insurance policy); Schor v. FMS Financial Corp., 357 N.J.Super. 185, 193-94, 814 A.2d 1108 (App.Div.2002) (need for extrinsic evidence). Defendants do not claim they expressly advised her that their representation was limited to her duties and responsibilities as executrix, irrespective of the impact on her as an individual or tax consequences to her personally, and thus it could have been "reasonable" for her to have so understood the retainer. See Restatement (Third) of the Law Governing Lawyers, § 19 (2000); id. at § 19 cmt. c.[5]See also R.P.C. 1.2(c).[6] Moreover, as the Restatement now confirms,
In trusts and estates practice a lawyer may have to clarify with those involved whether a trust, a trustee, its beneficiaries or groupings of some or all of them are clients and similarly whether the client is an executor, an estate, or its beneficiaries. In the absence of clarification the inference to be drawn may depend on the circumstances and the law of the jurisdiction.
[Restatement, supra, § 14 cmt. f.]
See also American College of Trust and Estate Counsel, ACTEC Commentaries on the Model Rules of Professional Conduct, Commentary on MRPC 1.2 (3d ed.1999). Defendants had an obligation to define the scope of their representation of Clara more clearly. Accordingly, we reverse the grant of summary judgment as to Clara.

B.
The claim of Clara's sisters requires a different evaluation. As such, it must be asked if the "non-clients will rely on the attorneys' representations and the non-clients are not too remote from the attorneys to be entitled to protection." Petrillo, supra, 139 N.J. at 483-84, 655 A.2d 1354; see also Stewart, supra, 142 N.J.Super. at 593, 362 A.2d 581. The non-clients in this case are beneficiaries, and the tax burden affected them individually, if not differently. In deciding the issue before us, the overarching inquiry "involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." Estate of Fitzgerald, supra, 336 N.J.Super. at 468, 765 A.2d 251 (quoting Barner, supra, 292 N.J.Super. at 261, 678 A.2d 767 (quoting Goldberg v. Hous. Auth. of Newark, 38 N.J. 578, 583, 186 A.2d 291 (1962))). See also Banco Popular N. Am. v. Gandi, 184 N.J. 161, 179-81, 876 A.2d 253 (2005); Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439, 625 A.2d 1110 (1993); Restatement, supra, §§ 51, 56 cmt. c.[7] As such, *338 we must consider whether the beneficiaries' interest is adverse to the testator's intent or the interest of the Estate and what the reasonable expectation of the sisters may have been.
Plaintiffs contend that "Lolio was certainly aware of the identity of the two other beneficiaries" and that the beneficiaries' "familial relationship to the executrix. . . is certainly not `too remote' to absolve [him] from liability for deviations from accepted standards of legal practice[.]" They further assert that Clara "certainly invited her two sisters to rely upon Mr. Lolio's opinion and actions in assisting [Clara] in settling their deceased mother's estate[,]" and that Clara "owed a fiduciary duty to her two sisters of which Mr. Lolio was certainly aware, and his failure to advise that the use of the IRA moneys to pay federal estate taxes exposed Clara Heffernan to liability for breach of her fiduciary duties. . . ."
However, we were told at oral argument that neither sister has charged Clara with a breach of fiduciary duty, commenced any type of action against her, or contested any accounting. We are therefore not concerned in this case with any third party action flowing from a suit against a client vested with a fiduciary duty to that third party relative to the impact of the advice the client received and acted upon to the detriment or injury of the third party. See Restatement § 56, cmt. c. See also ACTEC Commentaries, supra. Nor was there any claim of breach of a fiduciary duty by Clara as a result of the action she took. As a result, we decline to hold defendants liable to Clara's sisters. This is particularly so because there are no allegations of any communications by defendants with or directed to the sisters, and under the retainer agreement, defendants represented the Estate and its executrix, not the beneficiaries who may have different interests. In fact, the personal tax consequences to each may well be different. See Restatement, supra, § 51(2), (3), (4). As a result, we decline, under the facts as alleged, to extend the duty a lawyer owes to third parties who are beneficiaries of an estate the lawyer represents, or to hold that the attorney has an obligation to consider and advise all beneficiaries of the tax consequences of a bequest or legacy.

V.
The judgment is affirmed as to plaintiffs Anne and Judy Albanese, but reversed as to plaintiff Clara Heffernan. The matter is remanded for further proceedings consistent with this opinion.
NOTES
[1] The plaintiffs have chosen to use the names as stated in the caption, and we do the same.
[2] This case has been settled as to DeLorey and Prism.
[3] As there is no issue of tax law raised before us and no dispute on that subject for purposes of this appeal, we do not address any question relating to taxation in this opinion.
[4] We have said that, generally, an attorney retained to represent the estate represents the executor or executrix as a fiduciary and not the estate as an entity. Estate of Fitzgerald, supra, 336 N.J.Super. at 469, 765 A.2d 251 (quoting Barner, supra, 292 N.J.Super. at 265-66, 678 A.2d 767). See also American College of Trust and Estate Counsel, ACTEC Commentaries on the Model Rules of Professional Conduct, Commentary on MRPC 1.2 (3d ed.1999), available at http://www.actec.org/pubInfoArk/comm/mrpc12.html.
[5] A lawyer can reasonably limit the duty otherwise owed if "the client is adequately informed and consents." Restatement, supra, § 19.
[6] At the time the retainer was executed, R.P.C. 1.2(c) provided that "[a] lawyer may limit the objectives of the representation if the client consents after consultation." R.P.C. 1.2(c) (2000).
[7] Clara's sisters claim that defendants breached a duty to them as non-clients. As a result, we do not believe R.P.C. 1.2(c) applies. See also Restatement §§ 14, 19; Banco Popular N. Am., supra, 184 N.J. at 179-81, 876 A.2d 253.