**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4119-16T1

GARY REINERT,

    Plaintiff-Appellant,

v.

ANDREW INDECK, ESQUIRE, and
WEBER GALLAGHER SIMPSON
STAPLETON FIRES & NEWBY,
LLP,

    Defendants-Respondents.

_____

Argued May 31, 2018 — Decided September 7, 2018

Before Judges Haas and Rothstadt.

On appeal from Superior Court of New Jersey,
Law Division, Burlington County, Docket No.
L-0427-15.

Jack Meyerson argued the cause for appellant
(Meyerson & O'Neill, attorneys; Jack Meyerson,
of counsel and on the brief).

Jeffrey B. McCarron argued the cause for
respondents (Swartz Campbell, LLC, attorneys;
Jeffrey B. McCarron and Kathleen M. Carson,
on the brief).

PER CURIAM

Plaintiff, Gary Reinert, appeals from the Law Division's September 11, 2015 order that granted, in part, defendants Andrew Indeck's and Weber Gallagher Simpson Stapleton Fires & Newby LLP's (WGSSFN) motion to dismiss plaintiff's complaint under Rule 4:6-2(e) for failure to state a claim upon which relief could be granted.[1] The complaint alleged professional negligence against Indeck and his law firm, WGSSFN, as well as his former law firm, defendant Scarinci Hollenbeck, LLC (SH). According to plaintiff, the lawyers were negligent in representing a company, in which plaintiff had an ownership interest, in an unsuccessful arbitration. He also claimed that he received deficient advice about establishing a defined benefit plan (DBP) for the company that caused him to later settle a lawsuit that the claimants in the arbitration filed against plaintiff under the New Jersey Fraudulent Transfer Act (NJFTA), N.J.S.A. 25:2-20 to -34. That

---

[1] Although plaintiff's June 15, 2017 amended notice of appeal also identifies the appeal being from the Law Division's April 21, 2017 order granting Indeck and WGSSFN summary judgment and dismissing the balance of plaintiff's complaint, his merits brief is limited to the September 11, 2015 order and his appendix does not contain any documents filed in support or in opposition to the summary judgment motion. We therefore limit our review to the earlier order. See Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011) (stating "[a]n issue not briefed . . . is deemed waived" (citations omitted)); see also R. 2:6-1(a)(1)(I) (requiring an appellant to provide us with "such . . . parts of the record . . . as are essential to the proper consideration of the issues").

complaint alleged that plaintiff transferred assets from the company in the arbitration to another entity he controlled.

The trial court dismissed plaintiff's claims arising from the arbitration because he did not have standing to sue as defendants did not represent him individually in the arbitration to which he was not a party. Plaintiff argues on appeal that the trial court erred in dismissing his claims because but for defendants' negligence, the company that was a named party in the arbitration, would not have been subject to a multimillion-dollar judgment, and he would not have ultimately been personally exposed to the NJFTA action. For the reasons that follow, we affirm.

The facts giving rise to plaintiff's claims as derived from his complaint are summarized as follows. In December 2005, Christopher Pizzo, the principal of Noble Learning Systems, Inc. (NLS), entered into a distribution agreement with Damian Ross, the sole member of Zenshin, LLC (Zenshin), to sell instructional self-defense videos produced by Carl Cestari, a martial arts instructor. The distribution agreement between Zenshin and NLS contained an arbitration clause addressing any disputes arising from the agreement.

After Cestari's death, a dispute arose between Ross and Pizzo about the continued distribution of the Cestari videos. In the meantime, Pizzo developed his own new videos and organized new

entities, including Close Combat Company, LLC (CCC), to market them. CCC, however, never held any assets or conducted any sales or marketing activities related to the Cestari videos.

In December 2007, Ross and Zenshin sued Pizzo and NLS based upon their continuing sale of the Cestari videos. Two months later, they filed another action to enjoin Pizzo, NLS and CCC from distributing the videos.[2] The attorney representing the defendants in those actions had the dispute diverted to arbitration in accordance with the parties' agreement.

At the time Ross filed his lawsuits, CCC was inactive and had no assets. Later, CCC's activities changed and it became profitable. That change occurred after Pizzo hired plaintiff in 2007 as a consultant to NLS for the purpose of creating a business plan for the company. The plan he developed called for the creation of yet another company which plaintiff would manage. Rather than start a new company, Pizzo reactivated CCC to market the new videos, which thereafter became successful and realized a profit for several years. By April 2008, plaintiff supplied all of CCC's funding through his contribution of personal funds in the

---

[2] We briefly addressed the specific claims made by Ross and Zenshin in an earlier unpublished opinion in which we affirmed the Chancery Division's confirmation of the arbitration award. See Zenshin, LLC v. Close Combat Co., LLC, No. A-0313-12 (App. Div. Aug. 21, 2013) (slip op. at 4). Those details need not be repeated here for our purposes.

amount of $100,000 and he "became part owner, and [chief operating and financial officer] of CCC . . . ." Plaintiff and Pizzo shared the profits from the sale of the new videos equally, with plaintiff also receiving an annual salary of $650,000.

In 2009, plaintiff and Pizzo retained Indeck, who was then with SH, to replace the attorney representing CCC, NLS and Pizzo in the arbitration. Indeck had previously represented plaintiff in unrelated personal matters. Indeck's and SH's hiring was confirmed in a February 18, 2009 retainer letter sent by Indeck on behalf of SH. The letter was addressed to plaintiff, Pizzo and CCC at the business's address, and referenced the action filed by Ross and Zenshin, naming CCC, NLS and Pizzo as the only defendants in the action it described as the "Arbitration Matter[.]" The retainer letter stated that "[y]ou have asked that we perform legal services in connection with an arbitration matter filed by the Claimants in the above matter." Pizzo and plaintiff signed the letter. The letter did not designate their signatures as being on behalf of CCC or NLS.[3]

---

[3] Notably, in November 2009, plaintiff retained Indeck and SH pursuant to a separate retainer agreement to represent him in "various personal and corporate matters." The letter was sent to plaintiff only at his home address and referenced only "General Matters[.]"

In 2010, plaintiff discussed with Indeck the creation of a DBP for his retirement through CCC. By that time, Indeck had left SH and was with WGSSFN. Plaintiff explained to Indeck that he would be funding the plan with money plaintiff's wife obtained through the settlement of a personal injury action. According to plaintiff, Indeck assured him that he would not be personally liable for any judgment against CCC and that the arbitration would not create a problem for the establishment of the DBP, especially because CCC would ultimately be dismissed from the arbitration.

Contrary to Indeck's prediction, on January 25, 2012, the arbitrator struck the arbitration defendants' answer and defenses and entered summary judgment against them due to discovery violations. In April 2012, the arbitrator entered an award in favor of Ross and Zenshin in excess of $2.4 million against Pizzo, NLS, and CCC, jointly and severally. Ross and Zenshin successfully moved in the Chancery Division for an order confirming the arbitration and the court entered judgment in their favor against Pizzo, NLS and CCC in the total amount of $2,851,221.88. Indeck filed an appeal and we affirmed. See Zenshin, LLC, slip op at 4.

Ross and Zenshin filed a new action "seeking injunctive and declaratory relief and related damages" to collect the judgment. The "[c]omplaint alleg[ed] violations of the [NJFTA] against Pizzo, NLS, and CCC, and CCC's [DBP]." In spring 2013, plaintiff

"and his [own] company, Keystone Lighthouse, LLC, were added" as defendants to the suit. Ross and Zenshin alleged in an amended complaint that plaintiff formed a DBP "in an effort to hinder and obstruct [them] in the collection of their imminent arbitration award against [CCC]." After retaining new counsel, plaintiff paid $460,000 to settle the NJFTA matter. He claims that he incurred additional attorneys' fees and expenses, "includ[ing] approximately $46,000 in IRA/DB Plan penalties . . ., past and future lost wages, and damage to [his] personal and professional reputation."

On February 17, 2015, plaintiff filed his complaint in the underlying action. In his complaint, plaintiff alleged claims of negligence – legal malpractice (count 1), breach of contract (count 2), and breach of fiduciary duty (count 3) against Indeck, SH and WGSSFN. He also asserted a negligent supervision and vicarious liability claim (count 4) against both law firms.

In counts one and two, plaintiff alleged that defendants never advised him, Pizzo, CCC, or NLS that their representation "constituted a concurrent conflict of interest[,]" in violation of Rule of Professional Conduct 1.7. Plaintiff also asserted that defendants never sought their "informed consent to the waiver of the conflict of interest." Additionally, plaintiff alleged that Indeck "failed to defend CCC on the basis that it was a distinct,

A-4119-16T1

unrelated entity that did not sell or profit from the [Cestari videos]" and that the company was "inactive during the existence of the Pizzo/NLS/Ross business relationship . . . through February 2008."

Moreover, plaintiff asserted that Indeck mishandled the underlying arbitration matter by failing to: 1) comply with a discovery order; 2) "seek CCC's dismissal" from the matter; 3) recommend that CCC or plaintiff "obtain independent counsel or . . . advance separate claims or defenses[;]" 4) mitigate the damages that were awarded to Ross; and 5) inform him of the risks associated with creating a DBP for CCC while the underlying litigation was pending.

In support of count three, plaintiff alleged that defendants owed him a fiduciary duty because of the "ongoing attorney-client relationship" that existed before and during the underlying action and "as a shareholder of CCC . . . ." He also alleged that defendants failed "to advise [him] to obtain separate counsel, and" that they "accepted legal fees . . . from CCC, [and] utilized them to promote the defense of Pizzo and NLS, to the detriment of CCC."

In April 2015, defendants filed a motion to dismiss plaintiff's complaint under Rule 4:6-2(e), which Judge Patricia Richmond granted as to SH, but granted in part as to Indeck and

WGSSFN, dismissing only the claims arising from Indeck's representation of the parties to the arbitration. Prior to entering her order, Judge Richmond considered the parties' oral arguments on July 15, 2015 and then placed her decision on the record on the same date.

In her oral decision, Judge Richmond distinguished between the arbitration action to which plaintiff was not a party, and the NJFTA action where he was named as an individual defendant. The judge determined that plaintiff "was not a party to that arbitration and the $2.8 million verdict . . . was against CCC" and not plaintiff. However, she found that plaintiff had pled a viable claim of liability against Indeck and WGSSFN in the NJFTA action.

In her ensuing September 11, 2015 order as to Indeck and WGSSFN, Judge Richmond granted their motion to dismiss with respect to "the handling of the underlying arbitration litigation[,]" but denied it "to the extent the claims [were] based on . . . Indeck's alleged conduct concerning plaintiff's transactions involving the CCC['s DBP]." Accordingly, she dismissed all counts against Indeck and WGSSFN arising from the arbitration matter, and dismissed count four "of plaintiff's complaint for negligent supervision and vicarious liability . . . with leave granted to plaintiff to move to amend count [four] of the complaint to assert a vicarious

liability claim only to the extent of the non-dismissed substantive claim."

Following discovery, Indeck and WGSSFN filed a motion for summary judgment. After considering the parties written and oral arguments on April 21, 2017, another judge granted the motion, dismissing with prejudice the remaining claims against Indeck and WGSSFN. This appeal followed.

On appeal, plaintiff contends that his complaint "alleged sufficient facts to establish a legal malpractice claim[,]" and that he has standing to pursue the claim because he suffered a "personal harm" as a result of defendants' conduct and as a member of a limited liability company he "may bring a direct action." Moreover, he asserts that he "suffered a 'special injury' which allows him to sue individually, as opposed to bringing a derivative action[.]" We disagree.

We review de novo a trial court's order dismissing a complaint under Rule 4:6-2(e), applying the same standard as the trial court. See Stop & Shop Supermarket Co. v. Cty. of Bergen, 450 N.J. Super. 286, 290 (App. Div. 2017). That standard requires us to examine the challenged pleadings to determine "whether a cause of action is 'suggested' by the facts." Teamsters Local 97 v. State, 434 N.J. Super. 393, 412 (App. Div. 2014) (quoting Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989)). We

search the pleading "in depth and with liberality to determine whether a cause of action can be gleaned even from an obscure statement." Seidenberg v. Summit Bank, 348 N.J. Super. 243, 250 (App. Div. 2002) (citing Printing Mart-Morristown, 116 N.J. at 746). "[I]t is the existence of the fundament of a cause of action . . . that is pivotal[.]" Teamsters Local 97, 434 N.J. Super. at 412-13 (second alteration in original) (quoting Banco Popular N. Am. v. Gandi, 184 N.J. 161, 183 (2005)).

"A pleading should be dismissed if it states no basis for relief and discovery would not provide one." Rezem Family Assocs., LP v. Borough of Millstone, 423 N.J. Super. 103, 113 (App. Div. 2011) (citing Camden Cty. Energy Recovery Assocs., L.P. v. N.J. Dep't of Envtl. Prot., 320 N.J. Super. 59, 64 (App. Div. 1999), aff'd, 170 N.J. 246 (2001)). Ordinarily, dismissal for failure to state a claim is without prejudice, and the court has discretion to permit a party to amend the pleading to allege additional facts in an effort to state a claim. See Hoffman v. Hampshire Labs, Inc., 405 N.J. Super. 105, 116 (App. Div. 2009). Although leave to amend should be liberally granted, "without consideration of the ultimate merits of the amendment," it need not be granted where an amendment would be a "futile" and "useless endeavor." Notte v. Merchs. Mut. Ins. Co., 185 N.J. 490, 501 (2006) (citation

omitted); see also Prime Accounting Dep't v. Twp. of Carney's Point, 212 N.J. 493, 511 (2013).

In order for plaintiff's complaint to survive a motion under Rule 4:6-2(e), it must have pled sufficient allegations to establish a claim for legal malpractice. A claim for "[l]egal malpractice is a variation on the tort of negligence" relating to an attorney's representation of a client. Garcia v. Kozlov, Seaton, Romanini & Brooks, P.C., 179 N.J. 343, 357 (2004) (citing McGrogan v. Till, 167 N.J. 414, 425 (2001)). To establish a prima facie case of legal malpractice, a plaintiff must demonstrate: (1) the existence of an attorney-client relationship creating a duty of care upon the attorney to the plaintiff; (2) the breach of that duty by the attorney; and (3) such breach was the proximate cause of the damages sustained by the plaintiff. Jerista v. Murray, 185 N.J. 175, 190-91 (2005); Kranz v. Tiger, 390 N.J. Super. 135, 147 (App. Div. 2007). "The client bears the burden of proving by a preponderance of competent credible evidence that injuries were suffered as a proximate consequence of the attorney's breach of duty." Sommers v. McKinney, 287 N.J. Super. 1, 10 (App. Div. 1996) (citing Lieberman v. Emp'rs Ins. of Wausau, 84 N.J. 325, 342 (1980)).

We conclude from our de novo review that Judge Richmond correctly dismissed plaintiff's complaint with prejudice because

12

contrary to his arguments, he could not establish the required elements of an attorney-client relationship or that he personally suffered any damages as a consequence of defendants' actions in the arbitration.

First, it is beyond cavil that a lawyer representing a corporation or other business entity is not automatically deemed to represent its officers or shareholders. "By representing the organization, a lawyer does not thereby also form a client-lawyer relationship with all or any individuals . . . who direct its operations or who have an ownership or other beneficial interest in it, such as its shareholders." Restatement (Third) of the Law Governing Lawyers § 96 cmt. b (Am. Law Inst. 2000). This maxim is incorporated into our Rules of Professional Conduct that state: "A lawyer employed or retained to represent an organization represents the organization as distinct from its directors, officers, employees, members, shareholders or other constituents." RPC 1.13(a). The retainer letter here therefore did not establish an attorney-client relationship between plaintiff and Indeck or his firm in the "arbitration matter[.]" Plaintiff failed to allege any facts that established that the defendants knew or reasonably should have known that their representation of CCC implicated an attorney-client relationship with plaintiff. Cf. Restatement (Third) of the Law Governing Lawyers § 14 cmt. f (Am. Law Inst.

2000) (discussing circumstances under which a person associated with an organizational client may be deemed represented by the organization's attorney); Petit-Clair v. Nelson, 344 N.J. Super. 538, 543-44 (App. Div. 2001) (holding applicable RPC 1.8 and rejecting an attorney's argument that he represented only a closely-held corporation, and not its husband and wife owners, in obtaining the mortgage of their residence as security for the corporation's fee, where it was "undisputed that defendants [husband and wife] and plaintiff [attorney] related to each other as attorney and client"). Any claims by plaintiff that he understood that somehow defendants represented him individually in an action in which he was not a party, is belied by the fact that when he was to be represented individually, he signed a different retainer letter for that purpose.

However, as plaintiff argues, an attorney could have a limited duty to a non-client. Finding an attorney owes a duty to a non-client "has been applied rather sparingly," in "carefully circumscribed" holdings, LoBiondo v. Schwartz, 199 N.J. 62, 101, 116 (2009) (citation omitted), because the Court's "ordinary reluctance to permit non-clients to sue attorneys remains unchanged." Green v. Morgan Props., 215 N.J. 431, 460 (2013). Therefore, "the grounds on which any plaintiff may pursue a malpractice claim against an attorney with whom there was no

attorney-client relationship [remain] exceedingly narrow."  Id. at 458.

"[P]rivity between an attorney and a non-client is not necessary for a duty to attach 'where the attorney had reason to foresee the specific harm which occurred.'"  Innes v. Marzano-Lesnevich, 435 N.J. Super. 198, 213 (App. Div. 2014) (quoting Estate of Albanese v. Lolio, 393 N.J. Super. 355, 368-69 (App. Div. 2007)).  "Whether an attorney owes a duty to a non-client third party depends on balancing the attorney's duty to represent clients vigorously with the duty not to provide misleading information on which third parties foreseeably will rely[.]" Petrillo v. Bachenberg, 139 N.J. 472, 479 (1995) (citations omitted); accord Davin, LLC v. Daham, 329 N.J. Super. 54, 76 (App. Div. 2000) ("When considering the imposition of a duty upon an attorney, we must . . . consider the impact that duty will have upon the public, in general, and the attorney's client's right to vigorous and effective representation.").  "Ultimately, in determining whether a duty exists, '[t]he primary question . . . is one of fairness.'"  Innes, 435 N.J. Super. at 213 (alterations in original) (quoting Estate of Albanese, 393 N.J. Super. at 369).

A duty to a non-client has been found "in some circumstances [where] an attorney knows or reasonably should know that a non-

client will rely on the attorney's representation or opinion . . . ." <u>LoBiondo</u>, 199 N.J. at 101 (citing <u>Petrillo</u>, 139 N.J. at 483-84). For example, a duty arises where "an attorney . . . participated in a civil conspiracy with the goal of assisting a client to engage in a fraudulent transfer of assets to the detriment of a lender." <u>Innes</u>, 435 N.J. Super. at 213 (quoting <u>Lobiondo</u>, 199 N.J. at 102).

Here, plaintiff's allegations do not give rise to a duty owed to him by defendants arising out of the arbitration. Plaintiff claims that defendants owed him a duty under <u>Petrillo</u> because he reasonably relied on Indeck's statements that CCC would be dismissed from the litigation. Plaintiff also alleges that he did not believe he would be personally liable for damages resulting from the arbitration matter because Indeck never warned him that creating the DBP would create a personal risk to him in the litigation.

Both the prediction about the arbitration's outcome for CCC and Indeck's alleged failure to warn against plaintiff's personal liability did not amount to legal advice made by an attorney to his or her client or a representation made to a third-party upon which liability could attach. Attorneys are not guarantors of a successful outcome, nor are they answerable for every "error of judgment in the conduct of a case or for every mistake which may

16                                                          A-4119-16T1

occur in practice." 2175 Lemoine Ave. Corp. v. Finco, Inc., 272 N.J. Super. 478, 486 (App. Div. 1994) (citation omitted); see also Model Jury Charges (Civil), 5.51, "Legal Malpractice" (approved June 1979) ("The law recognizes that the practice of law according to standard legal practice will not necessarily prevent a poor result."). Further, when Indeck discussed the CCC's DBP with plaintiff, the company was solvent and the issue of plaintiff's potential liability had not arisen, and would not, until a judgment was entered against CCC and plaintiff, without Indeck's advice, transferred assets from CCC to his own company.

Second, the fact that CCC had a judgment entered against it as a result of the unsuccessful arbitration did not result in any harm to plaintiff that was distinct from an injury, if any, to the other shareholder, Pizzo. See Strasenburgh v. Straubmuller, 146 N.J. 527, 550 (1996) (stating that stockholders who suffer injuries to their stock that are the same as all other stockholders "may not recover for the injury to [their] stock alone, but must seek recovery derivatively [on] behalf of the corporation" (citation omitted)). A shareholder can recover in a non-derivative suit only if he or she suffers a special injury. "A special injury exists 'where there is a wrong suffered by [a] plaintiff that was not suffered by all stockholders generally or where the wrong involves a contractual right of the stockholders, such as the

right to vote.'" Strasenburgh, 146 N.J. at 550 (alteration in original) (citation omitted); see also Delray Holding, LLC v. Sofia Design & Dev. at S. Brunswick, LLC, 439 N.J. Super. 502, 510 (App. Div. 2015).

Plaintiff asserts that the NJFTA action was filed against him because the arbitration should not have been filed against CCC, contrary to Indeck's assurances it was not dismissed, and Ross and Zenshin sought to hold him liable for the judgment. However, none of his assertions are correct as the possibility of plaintiff's liability only arose when he transferred assets from CCC to his own company without any advice from Indeck. Under these circumstances, plaintiff's complaint did not allege he suffered any special injury that was proximately caused by CCC's attorneys' actions.

Finally, to the extent that plaintiff's claim relied upon any advice from Indeck about the formation of his DBP at CCC, that claim was dismissed on summary judgment and, as noted, he never appealed from that determination.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4119-16T1