EAST RIDGELAWN CEMETERY, A CORPORATION OF NEW JERSEY, PLAINTIFF-APPELLANT AND CROSS-RESPONDENT, v. WALTER G. WINNE AND TOBY FURST, SUBSTITUTED TRUSTEES, ETC., DEFENDANTS-RESPONDENTS AND CROSS-APPELLANTS, AND ADAM FRANK AS EXECUTOR, ETC., H. JEROME SISSELMAN, ET AL., CERTIFICATE HOLDERS, DEFENDANTS-RESPONDENTS AND CROSS-APPELLANTS, AND STATE OF NEW JERSEY, AND VIVIAN D. BELL, ET AL., AND MABEL L. SMITH, DEFENDANTS-APPELLANTS AND CROSS-RESPONDENTS.

Argued December 22, 1952—Decided February 16, 1953.

*Messrs. Robert Carey* and *Robert Carey, Jr.*, argued the cause for plaintiff-appellant (*Messrs. Carey, Pforr, Knoeppel & Ziff*, attorneys).

*Mr. William L. Rae* argued the cause for defendants-appellants.

*Mr. Theodore D. Parsons*, Attorney-General, argued the cause for the State of New Jersey.

*Mr. Samuel Kaufman* argued the cause for defendants-respondents and cross-appellants Adam Frank, *et al.* (*Messrs. Bilder, Bilder & Kaufman*, attorneys; *Messrs. Kessler & Kessler*, attorneys; *Mr. Sanford Freedman* and *Mr. John M. Kaufman*, on the brief).

*Mr. Isadore Glauberman* argued the cause for defendants-respondents and cross-appellants Walter G. Winne and Toby Furst.

The opinion of the court was delivered by

Jacobs, J. The Appellate Division (19 *N. J. Super.* 413 (1952)) modified the judgment which had been entered in the Chancery Division (11 *N. J. Super.* 555 (1951)) and remanded the cause for further proceedings; pursuant to cross-applications this court granted certification in the perhaps vain hope that the protracted controversy between the parties may be justly and finally determined.

Early in 1905 Adam Frank and his associates planned ·the establishment of a cemetery in Acquackanonk Township, now the City of Clifton, Passaic County, and obtained options in the name of Herbert B. Gruber, nominee of Frank, on land exceeding 250 acres. Since the governing statute restricted cemeteries to 125 acres, two corporations were thereafter formed, the plaintiff-appellant, East Ridgelawn Cemetery, and West Ridgelawn Cemetery, not a party to this action. East Ridgelawn was incorporated on October 3, 1905 , and its trustees were selected by Frank and his attorneys, and on December 12, 1905 a cemetery franchise was granted to it by the Township Committee of Acquackanonk. Thereafter Frank offered to convey the land to the cemeteries. His offer did not, however, embody any fixed valuation as the fair purchase price; instead, it provided that the land would be paid for by the cemeteries' joint issuance of 13,500 certificates of interest in the proceeds of their sale of burial plots. The offer was accepted by the cemeteries.

In 1906 Frank, through Gruber, acquired title to the land and allocated to East Ridgelawn 121 acres which had been obtained for the purchase price of $73,380. On December 21, 1906 Gruber conveyed the 121 acres to the Passaic Trust & Safe Deposit Company subject to the terms of a declaration of trust. This declaration provided that the land would be conveyed ·to East Ridgelawn; that East Ridgelawn would, jointly with West Ridgelawn, issue 13,500 certificates of interest to the Trust Company; and that East Ridgelawn would pay to the Trust Company, after deductions for a perpetual care fund, one-half of the proceeds from its sale of

burial plots plus what remained of the other half after payment of operating expenses. On January 3, 1907 the Trust Company conveyed the land to East Ridgelawn by deed bearing the same terms as the declaration of trust. The 13,500 certificates were issued and reached Frank, who returned 2,000 shares to East Ridgelawn for improvements and working capital. See *Bittles v. West Ridgelawn Cemetery Co.*, 94 *N. J. Eq.* 808, 809 (*E. & A.* 1923). East Ridgelawn realized the sum of $50,505 from the sale of these certificates and additional certificates which were later delivered to it.

In 1910 Vice-Chancellor Stevens dealt with the validity of the certificates and the dividend fund, representing proceeds from the burial plots, payable under the terms of the deed to East Ridgelawn. See *East Ridgelawn Cemetery Co. v. Frank,* 77 *N. J. Eq.* 36 (*Ch.* 1910). He pointed out that cemetery associations were in the nature of charitable trusts, had been granted, in the public interest, special powers and tax exemptions, and had properly been subjected to special limitations in their allocation and use of the proceeds of their sale of burial plots. He expressed the view that the Frank plan, which would enable extraordinary profits through payment of the land by a dividend fund from the proceeds of the burial plots, was contrary to the policy and letter of the controlling legislation and was illegal. Later decisions by the Court of Errors and Appeals took the same position. *Atlas Fence Co. v. West Ridgelawn Cemetery,* 119 *N. J. Eq.* 552 (*E. & A.* 1936); *Passaic National Bank & Trust Company v. East Ridgelawn Cemetery,* 137 *N. J. Eq.* 603 (*E. & A.* 1946), 139 *N. J. Eq.* 488 (*E. & A.* 1947). In the *Atlas Fence* case the court, after holding the dividend plan illegal, stated (at *p.* 555) that "the Trust Company is now entitled to receive the fair value of the estate conveyed to the Cemetery Association at the time of the conveyance, with interest, but without priority over other creditors." Similarly, in the *Passaic Bank* case the court's opinion, while rejecting the attempt to obtain any payment under the illegal dividend

plan, set forth the contention of the cemetery and the Attorney-General that the trustee was entitled to receive only the fair value of the land at the time of its conveyance with interest but without priority.

Following the decision in the *Passaic Bank* case East Ridgelawn instituted the present action in which it primarily sought a determination as to the nature and extent of its present obligation, if any, for the 121 acres conveyed to it. After hearing, the Chancery Division entered judgment of $167,245.59 with interest against the cemetery and in favor of Walter Winne and Toby Furst as trustees substituted for the former trustee Passaic Trust & Safe Deposit Company (later called Passaic National Bank and Trust Company). In reaching its judgment the court: (1) found that the fair value of the land payable to the trustees was $138,510, representing its cost of $73,380 plus $65,130 as promoter's profit; (2) allowed $50,505 to the trustees, representing the sum received by the cemetery from the certificates returned to it, and (3) credited the cemetery with the sum of $16,691.98 paid by the cemetery to the Trust Company and $5,077.43 representing an adjusted amount due to the cemetery. On the appeal before the Appellate Division these amounts credited to the cemetery were not questioned or disturbed. Similarly, that Court refused to disturb the allowance to the trustees of the $50,505 actually realized by the cemetery from the sale of the certificates. However, it disallowed the promoter's profit of $65,130 and remanded the cause to the Chancery Division for a new determination as to the purchase price payable for the land "measured by the value, at the time, of the lands to the cemetery" holding the exclusive cemetery franchise, with interest at 3%. On the issue of value two expert witnesses for the plaintiff-appellant had testified that the farm land conveyed to the cemetery was worth less than the sum of $73,380 paid for it by Frank and a third had testified that its value was not increased by its transfer to the cemetery. Two expert witnesses for the defendants cross-appellants had testified that the price paid

by Frank was the fair value of the farm land without considering the cemetery franchise, but that its fair value as cemetery land of the association holding the cemetery franchise was in excess of $650,000; their position was that the pre-existing fair value of land generally increases ten-fold when attached to a cemetery franchise.

 Frank, the promoter and first president of East Ridgelawn, clearly dominated the cemetery association at inception; he was a fiduciary and as such was subject to recognized trust responsibilities in his dealings with the association. See *Bigelow v. Old Dominion Copper Mining & Smelting Co.*, 74 *N. J. Eq.* 457, 496 (*Ch.* 1908); *Arnold v. Searing*, 78 *N. J. Eq.* 146, 157 (*Ch.* 1910). His was the affirmative obligation to deal openly and fairly with the association and with due regard for the protection and advancement of its proper interests. *Cf. Ballantine, Corporations* (*rev. ed.* 1946), 832; 1 *Fletcher, Corporations* (*rev. ed.* 1931), 617. This was particularly true where, as here, the association was a charitable trust which the Legislature had authorized to be operated in the public interest but not for private profit. See *East Ridgelawn Cemetery Corp. v. Frank, supra; Burke v. Gunther*, 128 *N. J. Eq.* 565, 571 (*Ch.* 1941), affirmed 133 *N. J. Eq.* 609 (*E. & A.* 1943); *Geo. Washington, &c., v. Memorial, &c., Co.*, 139 *N. J. Eq.* 280, 288 (*Ch.* 1947), s. c. 141 *N. J. Eq.* 47, 60 (*Ch.* 1947). As Vice Chancellor Stevens pointed out in the *Frank* case, the statute conferred "immunity from taxation and levy, coupled with the power of eminent domain," and it was evident that this was not done to enable operation of the cemetery for individual gain. It seems clear from the provisions of the governing statute that the Legislature contemplated that the cemetery association would purchase its required land for a definite price; that one-half of the proceeds from the sale of burial plots would be applied towards such purchase price until paid; and that the balance would be used for maintenance and improvement of the cemetery. Under recognized principles, any plan designed to circumvent this legislative scheme and

the public policy it represented was illegal and would be stricken down by the courts. See *Geo. Washington, &c., v. Memorial, &c., Co., supra*, 139 *N. J. Eq.*, at 287; *De Lorenzo v. City of Hackensack*, 9 *N. J.* 379, 388 (1952).

■ Frank, as promoter, undoubtedly performed services of value in the acquisition of the land and the launching of the cemetery operation. See *Allenhurst Park Estates v. Smith*, 101 *N. J. Eq.* 581, 594 (*Ch.* 1927). He could readily have tendered the land and made claim for fair compensation, and upon approval by the association acting through an independent board, binding agreements would have resulted. *Bigelow v. Old Dominion Copper Mining & Smelting Co., supra*, at 501. That would have been the reasonably safe course to pursue with benefit to himself and the association. He did not pursue it but chose to gamble with a scheme aimed at extraordinary profits but contrary to law. As a result, opportunity for reciprocally equitable agreements between the parties was frustrated and the association was subjected to costly litigation. The responsibility for all this may be placed at the doorstep of the promoter; nevertheless, a determination is now sought that the association pay: (1) for the promoter's services, and (2) for the land based on its fair value in the hands of the association holding the cemetery franchise. We agree fully with the Appellate Division's opinion that the claim for promoter's services has no place in the present proceeding in which the promoter, as such, is not a party, and must in any event fail. See 19 *N. J. Super.*, at 422. No such claim was at any time addressed to or approved by the association, nor was it ever asserted prior to the present proceeding. Whatever claim for services there might have been may, particularly when considered in the light of the promoter's avaricious conduct, now fairly be considered to have been barred by the lapse of over four decades.

. ■ ■ However, the claim that the association be directed to make payment for the land to the substituted trustees acting for the certificate holders, stands on a different foot-

ing; the association admittedly agreed to pay the trustee for the land which it actually received and retained. True, the specified mode of payment was illegal, but that in itself presents no just basis for allowing the association to keep the land without any payment at all. See *Attorney General v. Linden Cemetery Association*, 85 *N. J. Eq.* 501, 506 (*E. & A.* 1916). Indeed, in the earlier litigation, the association as well as the court gave expression to the view that, the agreed mode of payment being void, the fair value of the land at the time of the conveyance ought be paid. See *Passaic National Bank & Trust Company v. East Ridgelawn Cemetery, supra*, 137 *N. J. Eq.*, at 606; *Atlas Fence Co. v. West Ridgelawn Cemetery, supra*, at 556. Both the Chancery Division and the Appellate Division found that the land had never, in fact, been paid for, and their finding is sufficiently supported by the record. The association now seeks to assert that the claim should be barred by the statute of limitations and under doctrines of laches and estoppel. The statute is in nowise applicable in this purely equitable proceeding, and the pertinent circumstances negative the invocation of the doctrines advanced. Since the conveyance, payment for the land has been persistently sought and, with equal persistence, resisted by the association. The resistance, while properly based upon the illegality of the stipulated mode of payment, was always accompanied with fair recognition by the association of its obligation to pay for the land. After Vice-Chancellor Stevens rendered his decision in the *Frank* case two validating acts were passed (*L.* 1911, c. 299 and *L.* 1913, c. 272), and apparently the parties thereafter assumed that the stipulated mode of payment was effective. In 1933 a decree was actually entered in the Court of Chancery, in an action which did not join the Attorney-General as a party, directing payment in the stipulated mode (see 19 *N. J. Super.*, at 419), and it was not until the 1947 decision in the *Passaic Bank* case that it was finally determined, in an action naming the trustee, the association, the Attorney-General, and others, as parties, that the stipulated

mode of payment could neither be honored nor enforced. It was in that action that both the association and the Attorney-General seemingly acknowledged liability for the land conveyed, with interest, but without priority over other creditors. Shortly thereafter the association instituted its present action, and answers and counterclaims formally asserting the claim for the fair value of the land were duly filed. In the light of the foregoing it seems clear that the essentials for application of doctrines of laches and estoppel are wholly lacking. See *Hinners v. Banville*, 114 *N. J. Eq.* 348, 357 (*E. & A.* 1933); *Riverton Country Club v. Thomas*, 141 *N. J. Eq.* 435, 448 (*Ch.* 1948), affirmed 1 *N. J.* 508 (1948); *Lawes v. Lynch*, 6 *N. J.* 1, 11 (1950).

We come now to the primary question as to the specific amount which should be paid by the association for the land. On this issue the defendants cross-appellants contend that they are entitled to the value of the land with the cemetery franchise attached, which their experts testified was in excess of $650,000 immediately after the conveyance. We consider this contention to be without merit. We are seeking the actual value of the land at the time it was tendered to the association but before any conveyance; we are not seeking the increased value of the land after title was actually conveyed to the association and had attached to the cemetery franchise. *Cf. Huntington v. Attrill*, 118 *N. Y.* 365, 381, 23 *N. E.* 544, 548 (*Ct. App.* 1890); *Currie v. Waverly & New York Bay R. R. Co.*, 52 *N. J. L.* 381, 396 (*E. & A.* 1890). In *Kimball Laundry Co. v. United States*, 338 *U. S.* 1, 5, 93 *L. Ed.* 1765, 1771 (1949), an eminent domain proceeding, the court aptly pointed out that "value" has many meanings, that oftentimes the value to the owner differs from the value to the acquirer, but that most things have a general demand which give them a value transferable from one owner to another. Ordinarily, this transferable value may be measured by the price which would voluntarily be agreed upon between an owner willing to sell and a buyer willing to buy. See *Clark v. Commercial Trust Co. of N. J.*, 119

*N. J. Eq.* 133, 139 (*Ch.* 1935); 1 *Bonbright, Valuation of Property* (1937), 59.

In a memorandum opinion filed by Vice Chancellor Bigelow in the *Atlas Fence* case he expressed the view that $300 an acre seemed "very high for farm land in 1907." Frank's purchases (through Gruber) averaged about $600 an acre, presumably because it was generally known that the land was being acquired for cemetery purposes. In Frank's (or Gruber's) hands the land could not under any acceptable standard be said to have increased ten-fold in value. If Frank were a total stranger to the association he might perhaps arbitrarily have fixed and obtained that as the purchase price in view of the urgent necessities of the buyer; such forced price would not, however, have established fair value. *Cf. Bonbright, supra.* In fact, he was not a stranger (*cf. Attorney General v. Linden Cemetery Association, supra*), but a fiduciary who had purchased the land for purposes of ultimate transfer to the association and was under obligation to deal openly and fairly with it, and any attempt at that juncture to exact such purchase price would have been unconscionable. See *Ballantine, supra.*

In view of the circumstances presented, we consider the expert testimony resting on the greatly increased value of the land in the hands of the association holding the cemetery franchise not particularly helpful. Apart therefrom, everything in the record before us points to a valuation not in excess of $73,380, and we believe that this principal amount ($73,380), plus interest thereon at 3% as fixed below, will constitute fair payment for the land. Considering that the illegal mode of payment was the responsibility of the fiduciary promoter, that as a result there has been protracted litigation heavily burdening the association, and that the amount represents a return of the full purchase price paid in the open market for the land, plus accumulated interest substantially in excess thereof, those claiming through the substituted trustees would seem to be in no just position to complain. Although the association does complain about

the allowance of any interest, we have concluded that its complaint is not well founded. It has had the land and its full benefits since 1907 without payment of any purchase price, and equitable considerations suggest the allowance of reasonable interest on the principal amount thus fixed and remaining unpaid. See *Agnew Co. v. Paterson Board of Education*, 83 *N. J. Eq.* 49, 67 (*Ch.* 1914), affirmed 83 *N. J. Eq.* 336, 339 (*E. & A.* 1914), where the vice-chancellor rightly pointed out that the tendency of courts "has been to break away from hard and fast rules and charge and allow interest in accordance with principles of equity, in order to accomplish justice in each particular case." See also *Hoover Steel Ball Co. v. Schaefer Ball Bear. Co.*, 90 *N. J. Eq.* 515, 517 (*Ch.* 1919); *Brown v. Home Development Co.*, 129 *N. J. Eq.* 172, 178 (*Ch.* 1941). Determination of the particular rate of interest rested largely within the sound discretion of the Chancery Division and we find no occasion for disturbing its action in this regard which was affirmed by the Appellate Division. See *Liberty Title & Trust Co. v. Plews*, 6 *N. J. Super.* 196, 212 (*App. Div.* 1950), modified 6 *N. J.* 28 (1950).

The association attacks the Chancery Division's determination that it pay to the substituted trustees the sum of $50,505, with interest, representing the proceeds of the certificates sold by it. This action was affirmed by the Appellate Division (19 *N. J. Super.*, at 421) and we think properly. The evidence establishes that the certificates were issued under the original plan for payment and were delivered to the association at times when the parties assumed the plan to be enforceable. The association sold the certificates and retained the proceeds of $50,505 without ever paying any consideration therefor. Now that the original mode of payment has been formally voided and the certificate holders seek relief through the substituted trustees in this proceeding, it seems equitable that the association be held accountable, with interest, for the sum actually received by it. See *Bliss v. Linden Cemetery Ass'n.*, 83 *N. J. Eq.* 494, 503 (*Ch.* 1914),

modified *sub nom. Attorney General v. Linden Cemetery Ass'n., supra.* Although the status of the substituted trustees has been questioned by the association, we find no substantial basis for the attack. They were duly appointed by the United States District Court to act in the stead of the former trustee Passaic National Bank and Trust Company, and their appointment by such recognized court of general jurisdiction may not be collaterally attacked in this proceeding in our state court.

The only remaining matter warranting discussion is the association's contention that relief to the substituted trustees is barred by a release executed in 1912 by Frank to the association. The defendants cross-appellants assert that this contention was not advanced in the lower courts and may not be urged for the first time here. See *State ex rel. Wm. Eckelmann, Inc., v. Jones,* 4 *N. J.* 207 (1950), reargument denied 4 *N. J.* 374 (1950). Be that as it may, we are satisfied that the contention must be rejected. The release was personal to Frank and contained an express proviso that it shall not extend to his interest in "any certificates of shares of proceeds of sale of lots in the East and West Ridgelawn Cemeteries." It constitutes no barrier to relief in the present proceeding to the substituted trustees acting on behalf of the certificate holders.

The judgment entered in the Chancery Division is modified by exscinding therefrom the allowance of $65,130 as promoter's profit, by adjudging the fair value of the land to be $73,380, and by reducing the overall charge from $167,245.59 to $102,115.59 with interest; in all other respects the judgment is affirmed.

*For modification*—Justices HEHER, OLIPHANT, WACHENFELD, BURLING and JACOBS—5.

*Opposed*—None.