SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**Despina Alice Christakos v. Anthony A. Boyadjis, Esq.** (A-42-24) (090214)

**Argued October 6, 2025 -- Decided January 20, 2026**

**JUSTICE WAINER APTER, writing for a unanimous Court.**

In this appeal, the Court considers the appropriate standard for when an attorney owes a duty of care to a non-client such that the non-client can bring an action for legal malpractice.

Plaintiff Helen Christakos and her mother, plaintiff Despina (Alice) Christakos, brought this action alleging that attorney Anthony Boyadjis committed legal malpractice in preparing the 2018 wills of Peter and Nick Christakos, brothers of Alice's late husband, James.

In 2003, Peter and Nick executed mirror-image wills providing that upon one brother's death, his estate would go to the other brother. If the other brother had died, the estate was to be divided equally among two of Peter and Nick's then-living brothers, Constantine and James, per stirpes. In July 2017, Helen, who is an attorney, emailed Boyadjis, an acquaintance, asking him to contact Peter and Nick because Peter had told her they were "looking to get their wills/trusts in order." Helen did not know she was an heir under the 2003 will and had no further contact with Boyadjis until Peter died.

Boyadjis admits that he erroneously told Peter that, under the 2003 will, if one brother pre-deceased the other, the children of all their eight siblings would inherit, not just Helen and the daughter of Constantine. Peter then asked Boyadjis to prepare a new will for him and Nick, leaving everything to each other, but Peter was uncertain about the alternate residuary bequest. Peter later advised Boyadjis that he may want to leave some of his estate to his neighbor, a church, Alice, and Helen.

Boyadjis received an urgent call from Peter after both he and Nick were admitted to the hospital in January 2018. According to Boyadjis, Peter instructed him to prepare the wills so that the alternate residuary bequest would be split equally between the neighbor, the church, and Alice. Boyadjis brought the wills to the hospital, and Peter executed his will. Boyadjis testified that Nick did not have testamentary capacity at that time but was competent to sign his will in April 2018.

1

In what Boyadjis admits was a second error, both Nick's and Peter's 2018 wills conveyed only their personal property to the surviving brother, not the entire estate.

Peter died in April 2018 and Nick in October 2018. Their 2018 wills were probated over a challenge by Helen. Ultimately, the church and the neighbor each agreed to accept $100,000. The remainder of the estates was awarded to Alice.

Helen and Alice filed this malpractice action alleging that Boyadjis breached the duty of care he owed them as beneficiaries under Peter's and Nick's wills, including by: misinterpreting the brothers' 2003 wills, causing Peter to request a new will; incorrectly leaving Peter's estate to Alice, the neighbors, and the Church, rather than to Nick; and omitting Helen as a beneficiary from the 2018 wills.

Boyadjis sought summary judgment, claiming in part that he owed no duty of care to plaintiffs. The trial court denied the motion. The Appellate Division affirmed in part and reversed in part. It agreed that Boyadjis owed Alice a duty of care but disagreed that he owed a duty to Helen. The Court granted plaintiffs' motion for leave to appeal, 260 N.J. 201 (2025), and denied Boyadjis's cross-motion for leave to appeal, 260 N.J. 323 (2025).

**HELD:** The Court adopts the standard set forth in Section 51 of the Restatement (Third) of the Law Governing Lawyers for determining when an attorney owes a duty of care to a non-client. Here, the defendant attorney did not owe non-client plaintiff Helen Christakos a duty of care under either Section 51(2) or Section 51(3).

1. To sustain a claim for legal malpractice, a plaintiff must prove: (1) the existence of an attorney-client relationship creating a duty of care by the defendant attorney, (2) the breach of that duty by the defendant, and (3) proximate causation of the damages claimed by the plaintiff. Typically, non-clients are unable to show that the defendant attorney owed them a duty of care. Because allowing non-clients to sue attorneys for legal malpractice can chill zealous advocacy, instances in which an attorney has been held liable to non-clients have been carefully circumscribed, but the Court had not formally adopted a controlling standard. (pp. 16-17)

2. The Court now formally adopts the standard set forth in Section 51 of the Restatement (Third) of the Law Governing Lawyers that it has relied on in prior cases. First, under subsection (2) of Section 51, a lawyer owes a duty of care to a non-client when "(a) the lawyer or (with the lawyer's acquiescence) the lawyer's client invites the nonclient to rely on the lawyer's opinion or provision of other legal services, and the nonclient so relies; and (b) the nonclient is not, under applicable tort law, too remote from the lawyer to be entitled to protection." In finding that an attorney owed a duty of care to a non-client bank when he knew that his client had presented fraudulent financial statements but sent an opinion letter stating he was

2

unaware of any misrepresentations, the Court held that -- although a duty would not arise in circumstances involving no representations, no reliance, and a remote third party with whom the attorney had no relationship -- if the attorney's actions are intended to induce a specific non-client's reasonable reliance, then there is a relationship between the attorney and the third party to support a duty.  (pp. 17-20)

3.  Second, under subsection (3) of Section 51, a lawyer owes a duty of care to a non-client when: "(a) the lawyer knows that a client intends as one of the primary objectives of the representation that the lawyer's services benefit the nonclient; (b) such duty would not significantly impair the lawyer's performance of obligations to the client; and (c) the absence of such a duty would make enforcement of those obligations to the client unlikely."  Comment f. to Section 51 addresses situations in which a non-client seeks to enforce a lawyer's duties to a client.  It offers two illustrations that speak directly to the facts of this case.  In Illustration 3, if a client's intent to benefit a non-client does not appear on the face of a will, the non-client can establish a duty from the lawyer to the non-client only by producing clear and convincing evidence that the client communicated to the lawyer the client's intent that the non-client be the beneficiary of the will.  In Illustration 4, a lawyer is not subject to liability to an heir who alleges the lawyer negligently assisted a client to execute a will despite the client's incompetence because recognizing such a duty of care "would impair performance of lawyers' duty to assist clients even when the clients' competence might later be challenged."  (pp. 20-24)

4.  Here, Boyadjis did not owe Helen a duty of care under either Section 51(2) or Section 51(3).  There is no genuine dispute about Helen's lack of reliance on Boyadjis's legal opinion, an essential element under 51(2).  Neither Boyadjis nor Peter nor Nick ever invited Helen to rely on any opinion or statement by Boyadjis, and the evidence confirms that Helen did not so rely.  There is also no duty of care under Section 51(3)(a) because no reasonable jury could find clear and convincing evidence that Boyadjis knew that Peter and Nick intended their 2018 wills to benefit Helen.  As to Helen's contention that Nick's 2018 will should never have been executed for lack of testamentary capacity, the Restatement explicitly rejects this theory as grounds for a duty in a legal malpractice case.  Recognizing a duty to a purported heir could conflict with an attorney's vigorous representation of their actual client, and the Court declines to recognize such a duty here.  Because Helen cannot satisfy subsection 51(3)(a), the Court does not reach subsections (b) and (c).  (pp. 25-29)

 **AFFIRMED.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, FASCIALE, NORIEGA, and HOFFMAN join in JUSTICE WAINER APTER's opinion.**

SUPREME COURT OF NEW JERSEY
A-42 September Term 2024
090214

Despina Alice Christakos
and Helen Alexandra
Christakos,

Plaintiffs-Appellants,

v.

Anthony A. Boyadjis, Esq.,

Defendant-Respondent.

On appeal from the Superior Court,
Appellate Division.

Argued
October 6, 2025

Decided
January 20, 2026

Jay J. Rice argued the cause for appellants (Nagel Rice, attorneys; Jay J. Rice and Michael J. Paragano, of counsel and on the briefs).

Maximilian J. Mescall argued the cause for respondent (Mescall Law, attorneys; James C. Mescall, of counsel, and Maximilian J. Mescall, on the brief).

Diana C. Manning argued the cause for amicus curiae New Jersey State Bar Association (New Jersey State Bar Association, attorneys; Christine A. Amalfe, of counsel, and Diana C. Manning, Benjamin J. DiLorenzo, and Kyle A. Valente, on the brief).

1

This case asks us to determine the appropriate standard for when an attorney owes a duty of care to a non-client such that the non-client can bring an action for legal malpractice.  We adopt the standard set forth in Section 51 of the Restatement (Third) of the Law Governing Lawyers.  Because plaintiff Helen Christakos cannot meet that standard, we affirm the judgment of the Appellate Division.

## I.

Peter and Nicholas Christakos were two brothers who lived together in their childhood home in Clifton.  Neither ever married, and neither had children.  They were two of ten siblings.  Plaintiff Helen Christakos is the daughter of Peter and Nick's late brother, James.  Helen's mother, plaintiff Despina (Alice) Christakos, was James's wife.

In 2003, Peter and Nick executed mirror-image wills.[1]  The wills provided that upon one brother's death, his estate would go to the other brother.  If the other brother had died, the estate was to be divided equally among two of Peter and Nick's then-living brothers, Constantine and James, per stirpes.  The will also named executors in the following order:  Peter or

_____

[1]  Peter's 2003 will is in the record; Nick's is not.

2

Nick, Constantine, James, Helen, and Alexis (Constantine's daughter). In 2001, the brothers also granted Powers of Attorney (POA) in the same order.

Helen, who is a lawyer, lives in California. She testified at her deposition that she saw Peter and Nick once or twice a year and spoke with them several times a month. During a conversation in July 2017, Peter, who was then 86 years old, shared with her his "concern about his . . . failing health, and . . . about what would happen" to Nick, who was then 95 years old, if Peter died. At the time, Helen stood to inherit under the 2003 will as James's daughter, and she was attorney-in-fact under the 2001 POA, but she did not know about either. Alice, who moved to California in 2014, also knew nothing about the 2003 will or the 2001 POA.

On July 17, 2017, Helen sent an email to an acquaintance, defendant Anthony Boyadjis:

> I received a call from my Uncle Peter on Friday. He and my Uncle Nick are looking to get their wills/trusts in order. . . . [T]hey have been relying on neighbors to bring them food, supplies, etc. Peter says his neighbors are nice, but he is concerned that they have ulterior motives. He's worried that they are just being nice, because they are out for money. . . . Peter asked me to refer him to a lawyer to help get their affairs in order, and I wanted to see if this is something you could help with. . . . I suspect Nick and Peter had wills prepared years ago, but I don't know that for a fact. . . . [2] They

---

[2] Helen explained at her deposition that she suspected Nick and Peter had wills because she had seen a copy of her Aunt Stella's will when Stella died.

3

> may want to re-do their wills to leave some money to the neighbors. Or, they may want to consult . . . with you about setting up a trust. I'm not sure, and I didn't want to pry too much. . . . I'm happy to help facilitate with communication or being a trustee -- if that's what they want. I'm also fine being kept out of the loop if that's what they prefer.

After writing that her uncles would "appreciate a call," Helen had no further contact with Boyadjis until after Peter died. Alice did not communicate with Boyadjis at all until Peter died.

Boyadjis certified that he went to meet with Peter and Nick on July 25, 2017. According to Boyadjis, Peter showed him his 2003 will and stated that Nick's will was a mirror image. Peter asked what would happen "if one brother pre-deceased the other," as both James and Constantine had already died. Boyadjis stated that the children of Peter's siblings would inherit. Boyadjis later admitted that this was an error because under the 2003 will, only Helen and Alexis would inherit, not all of Peter's siblings' children. However, Boyadjis stated that even though he had seen Peter's 2003 will, he did not realize his error until after Peter and Nick died.

---

Stella was also single, never had children, and lived with Peter and Nick in Clifton. Stella's will provided that her estate be equally divided between Nick and Peter, or, if both predeceased her, between James and Constantine. According to Helen, the other siblings, Eugene and Alice, were omitted "likely because of a family feud." In the email, Helen wrote: "I suspect Nick and Pete probably have similar arrangements in their wills, but I don't know, and I haven't asked."

Boyadjis certified that after hearing his response about the nieces and nephew inheriting, "Peter was adamant that this . . . not occur" because he and Nick "had very little contact with these heirs and did not want them to receive any part of the estates."[3]  Peter therefore asked Boyadjis to "prepare a new [w]ill, for both him and Nicholas, leaving everything to each other in the first instance."  According to Boyadjis, Peter "was [still] uncertain about the alternate residuary bequest."

Boyadjis went to Clifton to meet with the brothers again in November 2017.  Boyadjis certified that while Peter "continued to express uncertainty over the alternate residuary estate, except for his strong desire to disinherit the nephew and nieces," he "advised that he may want to leave some of his estate to" his neighbor, Adrian Padilla (also referred to in the record as Adrian Cruz); to the St. George Greek Orthodox Church; and to Alice.  According to Boyadjis, Peter stated that the Cruz family, i.e., Adrian, his mother Maria, and her husband Francisco, "had been a lifeline for them, doing the shopping, bringing meals," etc.

Boyadjis's contemporaneous notes from the meeting, handwritten on a single sheet of paper, list "Neighbor Adrian Cruz $___?"; "St. George $___?";

---

[3]  In the complaint, plaintiffs allege that Nick and Peter wanted to disinherit only the children of Eugene, the sibling from whom they were estranged, not Helen and Alexis.

5

"Charities?"; "Alice Christakos $___"; "Helen Christakos $___." At his deposition, Boyadjis testified that Peter told him he needed additional time to decide, but "I may want to give something to Helen and I may want to give something to Alice." Boyadjis also testified that at some point, Peter told him that Helen was "not as bad as the other" nieces and nephew.

Boyadjis certified that he received an urgent call from Peter after both Peter and Nick were admitted to the hospital in January 2018. According to Boyadjis, Peter instructed him "to prepare each [w]ill so that the sole beneficiary would be the surviving brother and the alternate residuary bequest would be split equally" between Maria and Francisco Cruz, the Church, and Alice. Boyadjis brought the wills to the hospital, and Peter executed his will on January 3, 2018. Boyadjis assessed that "Nick on that date was not competent to execute a will," so Nick's will remained unsigned.

Boyadjis testified at his deposition that while he was at Peter and Nick's house coordinating a home health aide for Peter on April 6, 2018, Nick was "in a lucid state and ha[d] testamentary capacity." Boyadjis therefore returned on April 7 for Nick to execute his will. According to Boyadjis, Nick was "very coherent and lucid and just as sharp as he was the day before, which was sharp." Nick therefore signed the will.

6

However, the Passaic County Board of Social Services and Adult Protective Services had in fact been engaged, since February 2017, by physicians who were concerned that Peter could no longer safely care for Nick, and Nick could not care for himself. On March 28, 2018, when Nick was home but Peter was in the hospital, a psychiatrist examined Nick for the purpose of evaluating his competency. She wrote that Nick was disoriented, "demonstrated moderate to severe cognitive impairment," and likely had moderate to severe Alzheimer's disease. She concluded that he was "unfit and unable" "to govern himself and/or manage his affairs in any areas," and was incapable of attending a court hearing. She therefore recommended that he be adjudicated incompetent, and a legal guardian be appointed.

A second physician examined Nick and reached the same conclusion on April 10, 2018.[4] And one of the witnesses who observed Nick sign the will on April 7, 2018, testified that everything that the doctors found about Nick was true on that date.

In what Boyadjis admits was a second error, although the brothers intended for their entire estate, not just their personal property, to go to the

_____

[4] Both doctors noted that Adrian "assists [the] brothers with shopping and other household chores" and "Nicholas relies fully on the support of neighbor Adrian Padilla." A report submitted by a court-appointed attorney as part of the guardianship proceeding likewise documented that Adrian was at the home when she arrived, and Nick told her that Adrian was "the biggest help."

7

surviving brother, both Nick's and Peter's 2018 wills conveyed only their personal property to the surviving brother, dividing the remainder of the estate equally between Maria and Francisco Cruz, the Church, and Alice.

Peter died on April 11, 2018. After Peter's death, the court-appointed interim administrator located an undated note from Peter to Nick:

> Nick -- [here's] something we have to think about. Our wills. If I die before you -- there is no problem, you get it all!!! Approximately $630,000.00+. Out of that I may send a check to St. George Greek Orthodox Church and also give some to Mariann because she's been such a help. Our only help. . . . If you go before me, I will leave all to Mariann and the Church, there's no one else who gives a dam!!! If we didn't have Mariann, we would have nobody. Right now we need somebody.

On April 20, 2018, Helen filed a caveat in Surrogate's Court challenging Peter's 2018 will because it did not convey all of Peter's assets to Nick. Boyadjis filed an order to show cause and a verified complaint seeking (1) appointment as executor of Peter's estate; (2) reformation of Peter's will to reflect Peter's intent to convey his entire estate to Nick; (3) admission of the reformed will to probate; and (4) dismissal of Helen's caveat.

While the probate matter was pending, the Passaic County Board of Social Services moved to appoint Helen as Nick's guardian. The court appointed an attorney who interviewed Nick, Helen, Alice, Boyadjis, and Adrian and Maria Cruz. The attorney submitted a report objecting to Helen's

8

appointment because "Nick has expressed to me that he does not wish for Helen, or his family 'from California' to be involved in his personal, legal or financial affairs."

Nick died on October 2, 2018. Following Nick's death, Helen filed another caveat and Boyadjis filed another order to show cause and verified complaint. Helen eventually sought (1) denial of probate of Nick's 2018 will; (2) production of Nick's 2003 will; (3) admission of Nick's 2003 will to probate; and (4) appointment as executrix of Nick's estate. The probate proceedings were consolidated.

In January 2020, Helen and Alice, in their individual capacities, sued Boyadjis for legal malpractice, breach of fiduciary duty, and other claims. They alleged that as "an attorney who prepared estate planning documents," Boyadjis owed them, the beneficiaries, a duty of care. Helen and Alice alleged that Boyadjis breached that duty by (1) misinterpreting the 2003 wills, and thus causing Peter to request a new will; (2) incorrectly leaving Peter's estate to Alice, the neighbors, and the Church, rather than to Nick; (3) omitting Helen as a beneficiary from the 2018 wills; and (4) signing Peter's name on contracts when Helen was the attorney-in-fact.

In the probate proceedings, the interim administrator listed the value of the estates at $915,000, while plaintiffs valued the estates at over $1 million.

9

The Cruz family and the Church each agreed to accept a payment of $100,000. On January 18, 2023, the probate court issued a consent order approving those payments; approving a $53,000 payment to the interim administrator for his services; and directing that Alice receive the remainder of the estates. The court also directed that the modified 2018 wills be admitted to probate and Helen be appointed Administrator C.T.A.[5] of the estates.

In the legal malpractice action, Plaintiffs obtained an expert report from Ronald L. Davison, Esq. Davison opined that Boyadjis owed a duty of care to Helen and Alice because he "knew or should have known that the advice he was giving and the services he provided to Peter and Nick were intended to benefit the [will] beneficiaries" and that "if he gave incorrect advice or provided negligent services, the beneficiaries would be harmed." Boyadjis breached the duty of care, Davison maintained, by misadvising Peter and Nick about what the 2003 wills said and never informing Peter or Nick about that error, thus misleading Peter into thinking he needed a new will. According to Davison, Boyadjis also negligently prepared the 2018 wills and asked Nick to sign without properly ascertaining that he had testamentary capacity.

---

[5] "Administrator Cum Testamento Annexo" (C.T.A.) refers to an administrator who is appointed when there is either no executor provided in a testator's will or the executor named can no longer serve. Here, Boyadjis renounced executorship for both wills in February 2023.

As damages, Alice, who was pro se in the probate proceedings, sought the money paid to the Cruz family, the Church, and the interim administrator. Helen sought approximately $575,000 in legal fees.

Boyadjis sought summary judgment, claiming: (1) he owed no duty of care to plaintiffs; (2) plaintiffs could not establish proximate cause between his conduct and any alleged damages, of which there were none, because Alice received far more under the 2018 wills than Helen could have received under the original 2003 wills; and (3) plaintiffs were judicially estopped from arguing that Nick lacked testamentary capacity to sign his 2018 will because they had asked for that will to be probated.

The trial court denied the motion, finding that Boyadjis owed plaintiffs a duty of care because they were "known potential beneficiaries of the estates" and "Boyadjis was aware that legal work in misinterpreting and drafting new Wills would reasonably affect Plaintiffs as beneficiaries." As to whether Boyadjis breached that duty or proximately caused plaintiffs' damages, the trial court held that both were questions of fact for a jury.

The Appellate Division granted Boyadjis's motion for interlocutory appeal. Relying on tests set forth in Pivnick v. Beck, 326 N.J. Super. 474, 477-78 (App. Div. 1999), aff'd o.b., 165 N.J. 670 (2000); Estate of Albanese v. Lolio, 393 N.J. Super. 355, 368 (App. Div. 2007); Petrillo v. Bachenberg, 139

11

N.J. 472, 483-84 (1995); Banco Popular North America v. Gandi, 184 N.J. 161, 181 (2005); Restatement (Third) of the Law Governing Lawyers (Restatement) § 51(3) (Am. Law Inst. 2000); and Stewart v. Sbarro, 142 N.J. Super. 581, 593 (App. Div. 1976), the appellate court affirmed the trial court's determination that defendant owed Alice "a duty to correctly draft Peter's will" because the wills "were intended to benefit" Alice and the other beneficiaries "in the precise manner the decedent brothers had intended."

It disagreed, however, with the trial court's conclusion that defendant owed a similar duty to Helen, concluding that the record was "bereft of evidence that . . . Helen was an intended beneficiary" of Peter's and Nick's 2018 wills. "Indeed," the appellate court found, "the undisputed evidence established that in 2018 neither Peter nor Nicholas wanted their nieces and nephew[] to share in their estates. Thus, even if defendant had not erred, Helen would not have been a beneficiary of [the] estates." The Appellate Division rejected Boyadjis's judicial estoppel and proximate cause arguments, and therefore affirmed in part, reversed in part, and remanded.

Plaintiffs moved for leave to appeal. Boyadjis did not file a response. On March 11, 2025, we granted plaintiffs' motion. 260 N.J. 201 (2025). Boyadjis then cross-moved for leave to appeal. We denied the motion. 260

N.J. 323 (2025). We granted leave to appear as amicus curiae to the New Jersey State Bar Association (NJSBA).

## II.

Plaintiffs argue that the Appellate Division erroneously determined that Helen was not an intended beneficiary of Peter's and Nick's 2018 wills because it "ignored two critical facts: that Boyadjis admitted that he knew Helen was an intended beneficiary of the 2018 wills and that Nicholas's 2018 will was void for a lack of mental competence." Had Boyadjis carefully read the 2003 wills and properly advised Peter and Nick of their contents, plaintiffs contend, the 2018 wills would have never been drafted. And Nick's 2018 will was void, plaintiffs assert, because he lacked mental capacity to execute it. Nick's 2003 will, therefore, "was the proper [w]ill to probate," and pursuant to that will, assets would have passed to Helen. In the alternative, "[a]ssuming that Peter and Nicholas did have the testamentary capacity and wanted Boyadjis to draft new wills in 2018, then multiple statements and admissions existed to conclude that Helen was an intended beneficiary" of the 2018 wills.

Boyadjis contends that the Appellate Division has "split over which test to apply when analyzing legal malpractice claims from beneficiaries of an estate," alternatively relying on a communication-based test from Albanese and a foreseeability-based test from Stewart. He argues that this Court should

13

adopt the communications-based test from <u>Albanese</u> or the Restatement test, and should particularly adopt Illustration 4, which makes clear that a purported heir cannot, through a legal malpractice claim, argue that a lawyer negligently allowed their client to execute a will "despite [the] [c]lient's incompetence." <u>See</u> <u>Restatement</u> § 51(3) cmt. f., illus. 4. According to Boyadjis, that test precludes Helen's claim about Nick lacking testamentary capacity.

NJSBA urges this Court not to extend "the scope of attorney liability for malpractice . . . to include a duty to third parties" beyond what has been recognized by case law: (1) "if the attorney's actions are intended to induce," and do induce, a "non-client third party's reasonable reliance on the attorney's representations"; and (2) when "'the lawyer knows that a client intends as one of the primary objectives of the representation that the lawyer's services benefit the nonclient.'" (citing <u>Banco Popular</u>, 184 N.J. at 180, and quoting <u>Pivnick</u>, 165 N.J. at 671). NJSBA also maintains that under <u>Saffer v. Willoughby</u>, 143 N.J. 256, 271-72 (1996), fee-shifting in legal malpractice actions is only available "where an attorney acting in a fiduciary capacity for the benefit of a non-client <u>intentionally</u> breached the fiduciary duty owed."

III.

A.

We review a trial court's grant of summary judgment de novo. Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016). Summary judgment must be granted if "there is no genuine issue as to any material fact," and "the moving party is entitled to a judgment . . . as a matter of law." R. 4:46-2(c). "[W]hen deciding whether there exists a 'genuine' issue of material fact" or whether the moving party is entitled to judgment as a matter of law, the motion judge engages in the same analysis as "that necessary to rule on a motion for a directed verdict" and is "guided by the same evidentiary standard of proof -- by a preponderance of the evidence or clear and convincing evidence -- that would apply at the trial on the merits." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 533-34 (1995).

In other words, when the non-moving party will need to prove a fact by clear and convincing evidence at trial, a motion judge should grant summary judgment in favor of the moving party if, based on all the evidence in the record after discovery, no reasonable juror could find the fact proven by clear and convincing evidence. Clear and convincing evidence is "evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come

15

to a clear conviction, without hesitancy." In re Seamen, 133 N.J. 67, 74 (1993) (alteration in original) (internal quotation omitted).

The existence of a duty is generally a question of law for the court. Petrillo, 139 N.J. at 479.

B.

To sustain a claim for legal malpractice, a plaintiff must prove: "(1) the existence of an attorney-client relationship creating a duty of care by the defendant attorney, (2) the breach of that duty by the defendant, and (3) proximate causation of the damages claimed by the plaintiff." McGrogan v. Till, 167 N.J. 414, 425 (2001).

Typically, non-clients are unable to show that the defendant attorney owed them a duty of care. LoBiondo v. Shwartz, 199 N.J. 62, 101 (2009) ("The absence of a direct relationship between an attorney and a nonclient ordinarily negates the existence of any duty and, by extension, affords no basis for relief.").

We have long "endeavored to make certain that an advocate will be able to faithfully, fully and zealously represent his or her client without fear of reprisal from others." Id. at 100. And we have expressed concern that allowing non-clients to sue attorneys for legal malpractice "will not serve [the] legitimate purpose of creating a remedy for a nonclient . . . but instead will

16

become a weapon used to chill the entirely appropriate zealous advocacy on which our system of justice depends." Ibid. We have therefore held that "the grounds on which any plaintiff may pursue a malpractice claim against an attorney with whom there was no attorney-client relationship are exceedingly narrow." Green v. Morgan Props., 215 N.J. 431, 458 (2013); see also Restatement § 51 cmt. b ("Making lawyers liable to nonclients . . . could tend to discourage lawyers from vigorous representation. Hence, a duty of care to nonclients arises only in . . . limited circumstances . . . .").

C.

Although previous instances in which we have held "an attorney may be liable" to non-client third parties "ha[ve] been carefully circumscribed," Green, 215 N.J. at 458, we have not always clearly articulated the test for when an attorney owes a duty of care to a non-client such that the non-client can bring an action for legal malpractice. We do so now, expressly adopting the provisions of Section 51 of the Restatement (Third) of the Law Governing Lawyers that we have relied on in prior cases. See Petrillo, 139 N.J. at 483-84; Pivnick, 165 N.J. at 671; Banco Popular, 184 N.J. at 179-80.

17

1.

First, under subsection (2) of Section 51 of the Restatement, which we adopt, a lawyer owes a duty of care "to a nonclient when and to the extent that":

> (a) the lawyer or (with the lawyer's acquiescence) the lawyer's client invites the nonclient to rely on the lawyer's opinion or provision of other legal services, and the nonclient so relies; and

> (b) the nonclient is not, under applicable tort law, too remote from the lawyer to be entitled to protection[.]

> [Restatement § 51(2).]

We applied that test in Petrillo and Banco Popular. In Petrillo, we considered whether "an attorney for a seller [of real estate] has a duty not to provide misleading information to potential buyers who the attorney knows, or should know, will rely on the information." 139 N.J. at 474. Petrillo bought a piece of land after receiving a report, prepared by the seller's attorney, that misleadingly made it seem like two of seven percolation tests were successful when, in fact, "the property had passed only two of thirty percolation tests." Id. at 475. She sued the seller's attorney for negligent misrepresentation, arguing that his failure to provide the complete percolation reports violated the duty of care. Id. at 477.

18

In adopting the above-quoted language from what was then the proposed Restatement, we held "that attorneys may owe a duty of care to non-clients when the attorneys know, or should know, that non-clients will rely on the attorneys' representations and the non-clients are not too remote from the attorneys to be entitled to protection." Id. at 483-84. We therefore affirmed the judgment of the Appellate Division, concluding that the attorney "had a duty not to misrepresent negligently the contents of a material document on which he knew others would rely to their financial detriment." Id. at 489.

In Banco Popular, we allowed a bank to proceed with a negligent misrepresentation claim against the attorney for one of its creditors. 184 N.J. at 186. The bank alleged that to obtain a loan, the creditor provided fraudulent financial statements. Id. at 184. The creditor's attorney knew the statements were false, yet he "nevertheless negotiated the terms of the loan and rendered an opinion letter" to the bank stating that "[a]fter due investigation, we are unaware of any material matters contrary to the representations and warranties of the Borrower or the Guarantor contained in the Loan Documents." Id. at 185.

Again quoting the language from the by-then adopted and published Restatement, we affirmed in part. See id. at 179-80, 179 n.7, 186. In so doing, we reiterated that courts must "evaluat[e] whether the attorney invited a non-

19

client's reliance" because "the invitation to rely and reliance are the linchpins of attorney liability to third parties." Id. at 181. Thus, although "a duty would [not] arise in . . . circumstances . . . involving no representations, no reliance, and a remote third party with whom the attorney had no relationship," id. at 182, "[i]f the attorney's actions are intended to induce a specific non-client's reasonable reliance . . . then there is a relationship between the attorney and the third party" to support a duty, id. at 180. Because the attorney "intended the Bank to rely on [the] misrepresentation" contained in his opinion letter, we held that the bank had stated a claim against the attorney. Id. at 185-86.

2.

Second, under subsection (3) of Section 51 of the Restatement, which we also adopt, a lawyer owes a duty of care "to a nonclient when and to the extent that":

> (a) the lawyer knows that a client intends as one of the primary objectives of the representation that the lawyer's services benefit the nonclient;
>
> (b) such duty would not significantly impair the lawyer's performance of obligations to the client; and
>
> (c) the absence of such a duty would make enforcement of those obligations to the client unlikely[.]
>
> [Restatement § 51(3).]

20

Comment f. to Section 51 explains that "[w]hen a lawyer knows . . . that a client intends a lawyer's services to benefit a third person who is not a client, allowing the nonclient to recover from the lawyer for negligence in performing those services may promote the lawyer's loyal and effective pursuit of the client's objectives," especially where "the client has died" and the non-client may therefore "be the only person likely to enforce the lawyer's duty to the client." Restatement § 51 cmt. f. For that reason, "[a] nonclient's claim under Subsection (3) is recognized only when doing so will both implement the client's intent and serve to fulfill the lawyer's obligations to the client." Ibid. The comment warns, however, that "[w]ithout adequate evidence" of the client's intent, "upholding a third person's claim could expose lawyers to liability for following a client's instructions in circumstances where it would be difficult to prove what those instructions had been. Threat of such liability would tend to discourage lawyers from following client instructions . . . ." Ibid.

The comment goes on to explain that when a third person claims "that the lawyer failed to exercise care in preparing a document, such as a will, . . . the third person must prove the client's intent by evidence that would satisfy the burden of proof applicable to construction or reformation . . . of the

21

document." Ibid. In New Jersey, "clear and convincing evidence" is the burden of proof to reform a will. Pivnick, 165 N.J. at 671.

The comment then offers two illustrations that speak directly to the facts of this case. Both arise when "Client retains Lawyer to prepare and help in the drafting and execution of a will leaving Client's estate to Nonclient." Restatement § 51 cmt. f., illus. 2.

In the first, "Nonclient later alleges that Lawyer negligently wrote the will to name someone other than Nonclient" as the beneficiary, such that "Client's intent to benefit Nonclient . . . does not appear on the face of the will." Id. at illus. 3. In that situation, "Nonclient can establish the existence of a duty from Lawyer to Nonclient only by producing clear and convincing evidence that Client communicated to Lawyer Client's intent that Nonclient be" the beneficiary of the will. Ibid.

In the second, "[a]fter Client's death, Heir has the will set aside on the ground that Client was incompetent and then sues Lawyer for expenses imposed on Heir by the will, alleging that Lawyer negligently assisted Client to execute a will despite Client's incompetence." Id. at illus. 4. There, "Lawyer is not subject to liability to Heir for negligence. Recognizing a duty by lawyers to heirs to use care in not assisting incompetent clients to execute

22

wills would impair performance of lawyers' duty to assist clients even when the clients' competence might later be challenged." Ibid.

We adopted Section 51(3) of the Restatement, and comment f., in Pivnick. In Pivnick, the plaintiff brought a legal malpractice action against his father Harry's attorney, alleging that the attorney negligently drafted a trust agreement that did not reflect Harry's intent to disinherit the plaintiff's sister and leave Harry's entire estate to the plaintiff. 326 N.J. Super. at 477, 480. The Appellate Division noted that "[n]o New Jersey decision has held that a disappointed heir has a malpractice claim against an attorney for allegedly disregarding the testator's drafting instructions and leaving the heir less than the testator allegedly intended." Id. at 482. Although it declined to categorically bar such a claim, the court held that "where the only person who could explain what he wanted to accomplish by the Trust" or will is dead, a plaintiff in a malpractice action who seeks "to contradict solemnly drafted and executed testamentary documents" must meet "a clear and convincing burden of proof." Id. at 484.

The Appellate Division reasoned that imposing "[t]he clear and convincing burden" of proof serves three purposes. Id. at 485. First, it "fosters our strong policy that the language of testamentary instruments controls the disposition of property at death." Ibid. Second, it "discourage[s]

23

fraudulent claims." Ibid. And third, it "deters the more common problem of suits based on the sincerely held belief that the claimant deserved more than the will provided." Ibid.

Therefore, only "if a legal malpractice claim is supported by clear and convincing evidence that establishes an error in capturing the testator's intent" can the claim "succeed despite explicit conflicting language in the testamentary document." Ibid. The Appellate Division ultimately dismissed plaintiff's complaint. See id. at 491-92.

We affirmed, "substantially for the reasons stated in the opinion of the Appellate Division." 165 N.J. at 671. We added one additional source of "authoritative support," which we quoted at length: Section 51(3) of the Restatement, and comment f. See ibid.

3.

In formally adopting Section 51(2) and (3) to assess non-client claims against attorneys, we expressly decline to adopt the six-factor balancing test set forth by the Supreme Court of California in Lucas v. Hamm, 364 P.2d 685, 688 (Cal. 1961), and adopted by the Appellate Division in Stewart years before the Restatement. See 142 N.J. Super. at 593 ("The determination of whether the duty undertaken by an attorney extends to a third person not in privity involves the balancing of various factors, among which are the extent to which

24

the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm.") (quotation mark omitted).  Although some of the Lucas/Stewart factors are similar to considerations included in the Restatement, others are difficult to consistently apply and introduce unnecessary uncertainty into a lawyer's obligations to non-clients.

We similarly decline to adopt Boyadjis's "communication-based" test, in part because we do not read Albanese to adopt any such test.  We note, however, that our holding here is consistent with Albanese, in which the Appellate Division declined "to extend the duty a lawyer owes to third parties who are beneficiaries of an estate the lawyer represents."  393 N.J. Super. at 377; see also id. at 360-61, 377 (noting that there were "no allegations of any communications by" the lawyer "with or directed to the sisters" who were non-executrix beneficiaries of the estate).

IV.

Applying these principles to plaintiffs' motion for leave to appeal, we hold that Boyadjis did not owe a duty of care to Helen under either Section

25

51(2) or Section 51(3). We therefore affirm the judgment of the Appellate Division.

## A.

First, there is no genuine dispute regarding Helen's lack of reliance on Boyadjis's legal opinion, an essential element under Section 51(2). Neither Boyadjis nor Peter nor Nick ever invited Helen to rely on any opinion or statement by Boyadjis, and the evidence confirms that Helen did not so rely. As the Appellate Division noted, Helen had no communication with Boyadjis between the time she asked him if he could contact her uncles and the time of Peter's death. She testified that before Peter died, she never saw a draft of the 2018 will and never discussed anything related to it with Boyadjis, Peter, or Nick. Boyadjis never provided Helen with any legal opinion, or any other statement. Helen admitted that she had no knowledge of the discussions that occurred between Boyadjis, Peter, and Nick. Therefore, there was no invitation to rely, and no reliance, that could create a duty of care from Boyadjis to Helen based on Petrillo and Banco Popular.

## B.

There is also no duty of care in this case under Section 51(3)(a). That is so because no reasonable jury could find clear and convincing evidence that Boyadjis knew that Peter and Nick intended their 2018 wills to benefit Helen.

26

1.

All agree that Peter and Nick's intent to benefit Helen "does not appear on the face of" the 2018 wills.  See Restatement § 51 cmt. f., illus. 3.  Yet Helen "wishes to prove" that Peter and Nick's intent, at least as to her being a beneficiary of their 2018 wills, "was exactly the opposite of what was clearly stated" in "the testamentary document[s]."  See Pivnick, 326 N.J. Super. at 485, 491-92.

Therefore, under Illustration 3 and Pivnick, Helen "can establish the existence of a duty from [Boyadjis] to [her] only by producing clear and convincing evidence that [Peter and Nick] communicated" to Boyadjis their intent that Helen be a beneficiary of their 2018 wills.  See Restatement § 51 cmt. f., illus. 3; Pivnick, 326 N.J. Super. at 485 (stating that only "if a legal malpractice claim is supported by clear and convincing evidence that establishes an error in capturing the testator's intent" can the claim "succeed despite explicit conflicting language in the testamentary document").

Helen cannot meet that standard.  In support of her claim that Peter and Nick intended for her to be a beneficiary of their 2018 wills, Helen relies on one handwritten page of notes from Boyadjis's meeting with Peter and Nick in November 2017, which includes "Helen Christakos $___."  Boyadjis also testified at his deposition that Peter characterized Helen as "not as bad as the

27

other" nieces and nephew, and Peter stated that while he needed additional time to decide, "I may want to give something to Helen and I may want to give something to Alice."

Those vague references cannot constitute clear and convincing evidence that Peter and Nick told Boyadjis that they intended the 2018 wills to benefit Helen, especially in light of three pieces of evidence that point the other way. First is Peter's handwritten note to Nick that if Nick predeceased Peter, Peter would leave everything he had to "Mariann and the Church" because "there's no one else who gives a dam!!!" Helen's name is altogether absent from the note. Second is the report from the attorney appointed to represent Nick in the guardianship proceeding recommending that Helen not be appointed Nick's guardian because "Nick has expressed . . . that he does not wish for Helen, or his family 'from California' to be involved in his personal, legal, or financial affairs." And third is Boyadjis's testimony that Peter and Nick repeatedly stated that they did not want any of their nieces or nephew to inherit.

A reasonable jury thus could not conclude, by clear and convincing evidence, that the brothers made it clear to Boyadjis that Helen was to be a beneficiary of their 2018 wills.

## 2.

As to Helen's contention that Nick's 2018 will should never have been executed because Nick lacked testamentary capacity, the Restatement explicitly rejects this theory as grounds for a duty in a legal malpractice case. As Boyadjis notes, Illustration 4 expressly provides that if a purported heir sues a lawyer alleging that the lawyer negligently allowed their client, who lacked testamentary capacity, to execute a will, the "[l]awyer is not subject to liability" to the purported heir for negligence. Restatement § 51 cmt. f., illus. 4. This is so because "[r]ecognizing a duty by lawyers to heirs to use care in not assisting incompetent clients to execute wills would impair performance of lawyers' duty to assist clients." Ibid.

In other words, recognizing a duty to a purported heir could conflict with an attorney's vigorous representation of their actual client. We decline to recognize such a duty here.

## 3.

Because Helen cannot satisfy subsection 51(3)(a), we do not reach subsections (b) and (c). We also do not reach the NJSBA's argument, which was neither raised nor adopted by any party to this case, about fee-shifting in legal malpractice actions under Saffer, 143 N.J. at 271-72.

29

## V.

We hold that Boyadjis did not owe Helen a duty of care necessary to sustain a legal malpractice claim. The judgment of the Appellate Division is therefore affirmed.

CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, FASCIALE, NORIEGA, and HOFFMAN join in JUSTICE WAINER APTER's opinion.